JaFITZSIMMONS, Judge.
In this suit for damages arising from a one vehicle accident in the east bound lane of I- *959 10 in Iberville Parish, the trial court apportioned fault and awarded damages to the plaintiff. We reverse in part, and affirm in part.
FACTS AND PROCEDURAL BACKGROUND
The accident that injured Ms. Barsavage occurred on October 11, 1988, at 10:30 p.m. Ms. Barsavage’s car left the paved surface on the left side of the east bound lane and briefly traveled on the dirt shoulder. When she tried to return to the highway, her tire blew out. The car flipped over several times on the surface of the highway. She suffered a herniated disc and cervical fracture.
Ms. Barsavage sued the'State of Louisiana, through the Department of Transportation and Development (DOTD). After a trial on the merits, the trial court apportioned 85% of the fault to Ms. Barsavage and 15% of the fault to the DOTD. The trial court awarded Ms. Barsavage $75,000 for past, present, and future physical pain and suffering, $25,-000 for mental anguish, $60,900 for past loss of wages, $178,624 for future earning capacity, $57,150 for future medical expenses, $30,-000 for future surgery, and $8,064.08 for past medical expenses. Ms. Barsavage filed a motion for a new trial, which was denied.
DOTD appealed and assigned error to (1) the apportionment of fault, (2) failure of the trial court to properly reduce the award of past and future lost wages because of plaintiffs failure to mitigate her damages, (3) the trial court’s failure to properly reduce the award for mental anguish because of plaintiff’s failure to mitigate, and (4) the award for future surgery when such an award was too speculative. No error was assigned to the award for past, present, and future physical pain and suffering or to the award for past and future medical expenses, with the exception of the $30,000 awarded for future |3surgery. Ms. Barsavage answered the appeal, and complained of the trial court’s apportionment of fault.[1]
TRIAL TESTIMONY AND EVIDENCE
Mr. Wayne Wess, an experienced truck driver, witnessed the accident. Mr. Wess testified that the night was dark and the black asphalt roadway surface was dark, rendering the area of the accident “pitch black.” Before the accident, he saw no warning signs or barricades that night to alert a driver to a construction zone. Signs were located further down the highway. As Ms. Barsavage passed Mr. Wess’ truck, he noticed that she was over quite a bit to the left. Mr. Wess saw Ms. Barsavage’s left tires go off of the paved portion of the highway onto the shoulder. When she tried to pull back onto the roadway, her tire blew and the car flipped over. After the accident, Mr. Wess inspected the drop off between the paved surface and the dirt shoulder at the point that Ms. Barsavage attempted to return to the roadway. He described a drop off differential between the two surfaces as eight inches. Mr. Wess testified that because of the darkness of the area and the roadway, and with no markings to delineate the shoulder, a driver could not tell where the roadway ended and the shoulder began.
Plaintiffs expert, Mr. Dwayne Evans, a registered electrical engineer, was qualified by the court as an expert in traffic engineering and accident reconstruction. In Mr. Evans’ opinion, the motorist entering a construction zone must be so advised and an atmosphere of safety must be created by the use of appropriate signs and barricades. The highway construction project log noted that the signs and barricades were “okay” on jAhe day of the accident, but the log does not say where they were placed. For safety *960 reasons, Mr. Evans stated that a shoulder drop off should not be more than two inches. A drop of more than two inches presented a hazard. Mr. Evans noted that in his review of the project contract, a drop off of more than two inches required the contractor to grade up the area to eliminate the difference. Mr. Evans opined that at night the outer limit of the paved surface would be very difficult to see. A temporary dashed center line is not a good guide to the edge of the roadway. Thus, under the conditions present at the time of the accident, it was substandard conduct not to have a line marking the edge of the roadway and the shoulder. In Mr. Evans’ opinion, the drop off of between six and eight inches caused the tire to blow out when Mr. Barsavage tried to return to the highway. The blow out caused the car to flip. DOTD offered no expert testimony on what caused the accident.
Christine Barsavage testified that at the time of the accident, she lived in Dallas, Texas. She was unfamiliar with the stretch of the interstate where the accident occurred. Ms. Barsavage had never experienced such a dark highway before that night. She remembered looking in the rear view mirror to check the position of the truck behind her. It was at that moment that her left tires left the paved portion of the highway. The dirt shoulder was very bumpy and the vehicle was hard to control. Ms. Barsavage testified that she slowed down a little, and immediately tried to return to the highway. She remembered no construction hazard warning signs; there were no lines on the edge of the roadway.
Approximately two weeks after the accident, Ms. Barsavage went back to the scene to view the area and try to find out what happened. She testified that the drop off was of varying depths between the dirt shoulder and the paved surface. The dirt was 15chunky and rocky. She estimated that the drop off at one point was the “length of a sixteen ounce Coke bottle.... ”
Bobby Roberts, plaintiffs expert in vocational evaluation, recommended a structured physical therapy program for Ms. Barsavage. However, when asked about the success of patients who had not had surgery within a short time after the accident, Mr. Roberts opined that the longer the patient goes “post-injury without remediating or resolving symptoms[,] the less likely we are to ever get that person rehabed.” Mr. Roberts noted that Dr. Llewellyn had told Ms. Barsavage to do certain exercises, but she had quit because the exercises were painful.
Ms. Barsavage called Glenn J. Delatte, Jr., the State Police Trooper who responded to the scene of the accident. The trooper testified that he had previously seen construction warning signs posted throughout the area, in the east and west bound lanes. He specifically mentioned a sign placed at the approximate beginning of the project. The accident scene was about four and one-half miles into the construction area. He confirmed that the tire blew out on the ear; there were no street lights; a dashed center line had been placed on the new asphalt; and, that the edge of the roadway had no lines marking it. The trooper opined that Ms. Barsavage over corrected when she tried to enter the highway. Trooper Delatte testified that the scene of the accident was in a particularly dark area of the interstate because the interstate lanes are divided by trees in that area. The east bound lane was forested on both sides. According to the trooper, the drop off between the paved portion of the roadway and the dirt shoulder was from two to three inches. The area he referred to was not where Ms. Barsavage went off the highway. Therefore, the drop off differential in that area could not have been created by the wheels on the soft dirt.
16James Tattie, a civil engineer for DOTD, testified that signs were placed at the beginning and end of the project, and every half mile between. DOTD had paved four feet more than the normal road width surface. No lines were placed on the edge of the roadway, delineating between the paved roadway and the paved portion of the shoulder, or between the paved portion and the dirt shoulder. Mr. Tattie stated that DOTD had no such requirement. The policy of the state, according to Mr. Tattie, was not to have a drop off beyond two inches. The shoulder had been worked on and graded. However, the work on the dirt shoulder was *961 not complete. Mr. Tattie admitted that he had not personally cheeked the signage on the night of the accident.
DOTD called its expert in vocational testing, counseling, and rehabilitation, Mr. William Joseph Cranburg. Mr. Cranburg noted that Doctors Whiteeloud and Llewellyn suggested surgery and indicated a good probability of success. Mr. Cranburg believed that Ms. Barsavage was a good candidate for rehabilitation services. The Texas rehabilitation program offered many free services, and could make a determination of Ms. Bar-savage’s eligibility for other services, including vocational training and physical therapy.
MEDICAL TESTIMONY
Dr. Raeburn Llewellyn, a board certified neurological surgeon, testified by deposition. Dr. Llewellyn treated Ms. Barsavage from May 17, 1989 until November of 1990. She did not return for an office visit after November. From time to time, Ms. Barsavage also saw Dr. Jarrott, Dr. Llewellyn’s associate.
Various tests, including a Magnetic Resonance Imaging(MRI) test, were ordered by Dr. Llewellyn. Both doctors repeatedly asked Ms. Barsavage to have the MRI, but she did not undergo the MRI until mid-1990. After a CAT scan and X-rays, Dr. Llewellyn diagnosed injuries to the sacrum and cervical vertebrae, muscle and ligament sprain of the lower back, and a fractured coccyx caused by the 1988 accident. The doctor’s notes contained ^notification by Ms. Barsavage of a second accident in May of 1989 and an injury at home later that year. The doctor opined that these secondary accidents aggravated the original injuries.
In July of 1989, Ms. Barsavage returned to Dr. Llewellyn. The doctor found lumbar sprain and aggravated soft tissue injury to neck and back. Ms. Barsavage was encouraged to be as active as she could tolerate and to return to light work. Ms. Barsavage returned to the office on November 9, 1990. She stated that she was in school, and not working. No significant changes in her condition were noted. On December 26, 1989, Dr. Llewellyn found moderate neck and back problems. She reported she injured herself while undergoing home treatment. On May 31, 1990, the MRI test was conducted. In June of 1990, Dr. Llewellyn noted evidence of the cervical injuries, but found that they were healing. From the MRI, the doctor found no cervical disc problem, but diagnosed a lower back disc protrusion or herniation. Dr. Jarrott examined her and felt that she could return to light work assignment and increase her activity level. The MRI test was repeated and evidence of the disc herniation was again found at L4-5. A lumbar myelogram and CAT scan were recommended to determine if the injury “was of the type that might likely worsen with time and that she should accept a surgery option to insure that she could be eighty percent comfortable eighty percent of the time and treat herself for muscle and ligament complaints that might persist after disc surgery.” Dr. Llewellyn believed that the surgery was a reasonable option to Ms. Barsavage’s other choice, that is, “restricted activities and avoidances, and treating herself with home heat and exercise activities....” With the surgery, she could alternatively sit and stand at intervals, commute back and forth to work, could occasionally lift twenty pounds, and would have zero disability from light work. She might be able to engage in volleyball and horseback riding, but the doctor would not advise it because of the chance of re-injury. Without surgery, she would have to accept a level of comfort only |⅜ fifty percent of the time, the continued use of medication, and possibly not being able to work. Dr. Llewellyn believed that the difference in recovery with surgery would be significant in a young woman like Ms. Barsavage.
Dr. Thomas Whiteeloud, Chairman of the Department of Orthopedic Surgery at Tulane University Medical School and on staff at the Tulane Medical Center as a board certified orthopedic surgeon, also testified by deposition. Dr. Whiteeloud only saw Ms. Barsavage one time, on March 23, 1992. He diagnosed a disc herniation at L4-5. Dr. Whiteeloud told Ms. Barsavage that she needed surgery and felt that it was a viable option. With surgery, Dr. Whiteeloud opined that Ms. Barsavage would suffer only a ten percent impairment, but no disability. She would be restricted from heavy manual *962 labor, but otherwise she could “do whatever she want[ed] to do.” Dr. Whitecloud would have placed no limitations on sporting activities. The surgery was scheduled by Ms. Barsavage for June 3, 1992. She was a Medicaid patient and the hospital was prepared to do the surgery under the Medicaid program. Ms. Barsavage did not show up for the surgery.
By deposition, Dr. Robert L. Stockton, a board certified neurological surgeon, testified that he saw Ms. Barsavage one time on May 17, 1993. Ms. Barsavage told Dr. Stockton that she had delivered a child approximately two weeks before the May visit. She reported pain in her neck, in her low back, and in both legs. After examination, Dr. Stockton found Ms. Barsavage to be disabled from performing usual work tasks and not employable. A CAT scan and MRI were scheduled and she was told to return in one month. She never returned.
Dr. Stockton stated that he did not suggest surgery because he needed the results of the tests before he could make such a decision. Particularly, the doctor wanted to make sure that any fractures had healed. Ms. Barsa-vage could still try surgery, but Dr. Stockton found that when a patient has not worked for four years, and experienced chronic pain during that same period, | ;¡“it’s very seldom that we can get a patient back to work under those circumstances.” The formation of scar tissue that contributed greatly to the pain could have been alleviated by earlier surgery. If the surgery had been done sooner, Dr. Stockton believed that a fifty percent chance existed that Ms. Barsavage could have returned to work.
FAULT OF THE PARTIES
The duty of the DOTD is to keep the highways and shoulders in reasonably safe condition. That “duty encompasses the obligation to protect a motorist who inadvertently drives onto the shoulder of the highway.” Campbell v. Louisiana Department of Transportation & Development, 94-1052 p. 5-6 (La.1/17/95), 648 So.2d 898, 901. Prudent behavior for a motorist who inadvertently drives off the paved roadway onto the shoulder is first to reduce the speed and then to attempt a gradual reentry after the motorist has regained control of the vehicle. Guidroz v. State, Through Department of Transportation and Development, 94-0253 p. 4 (La.App. 1st Cir. 12/22/94), 648 So.2d 1361, 1364.
“In apportioning faulty the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.” Campbell, 94-1052 at p. 7, 648 So.2d at 902. A determination of the allocation of fault by the trier of fact is a factual finding. Guidroz, 94-0253 at p. 7, 648 So.2d at 1366. Factual findings cannot be overturned in the absence of manifest error. The issue to be resolved by this court is not whether the trial court was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart v. State, through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). “After the court of appeal finds a ‘clearly wrong’ apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court’s | ipdiscretion.” Clement v. Frey, 95-1119, 95-1163, p. 7-8 (La.1/16/96), 666 So.2d 607, 611.
The trial court found that the DOTD had warned of the construction zone and that Ms. Barsavage’s own inattentiveness caused her to run off of the road. The trial court also believed that Ms. Barsavage “apparently panicked” when she attempted to return to the highway. In its reasons for judgment, the trial court stated that the drop off between the paved surface and the dirt shoulder of only one and one-half inches “should not cause an accident like this to happen.” Eighty-five percent of the fault was apportioned to Ms. Barsavage.
Based on our thorough review of the record, we can find no reasonable basis for the trial court’s apportionment of fault. DOTD did not dispute the plaintiffs version of the accident and how it happened. In written reasons for judgment, the trial court found that the drop off was one and one-half inches and that the DOTD met its duty to *963 adequately warn of construction hazards. We find no support for these conclusions. The trial court committed manifest error in its finding that the DOTD adequately warned this plaintiff of the particular unreasonable hazard created by DOTD in this case. We also find that the trial court erred in its estimation of the size of the drop off. These erroneous findings skewed the trial court’s determination of fault, and led the trial court into clear error in the allocation of fault.
All witnesses at the scene agreed on the darkness of the particular area of the interstate, the darkness of the road surface, the absence of lines marking the edge of the roadway, and the blow out of the tire, which caused the car to flip over. Because of the great difficulty in distinguishing between the paved surface and the dirt shoulder in such a dark area, we find an unreasonably dangerous condition was created by DOTD’s failure to mark the edge of the black paved surface or the edge of the shoulder in an area that was particularly dark at night. The lack of a requirement to mark the edge of the roadway at the time of | nthe accident does not waive DOTD’s duty to alert the motorist to the hazard created in this case under these circumstances. Mr. Evans testified that any edge marking or additional signs to warn of this particular hazard in this case would be relatively inexpensive. A “low shoulder” or “new shoulder” sign posted every half mile would be sufficient.
The record contains no basis for a finding that the drop off between the paved road and the dirt shoulder was one and one-half inches. The preponderance of the evidence points to a drop off of more than two inches. The testimony of Mr. Dwayne Evans, the only expert testimony on the subject, was that a drop off of more than two inches created a hazard.
The failure to warn the driver of the end of the paved surface under the peculiar circumstances here, coupled with the fact that the drop off was more than the two inches deemed reasonable, created an unreasonable risk. Mr. Evans opined that the tire blew out because of the substandard drop off. Thus, in comparing the conduct of the parties and the effect of the conduct on the causal relation, and “mindful of the deference we must give the trier of fact,” we find DOTD to be 70% at fault for the accident. Clement v. Frey, 95-1119, 95-1163 at p. 10, 666 So.2d at 612.
Ms. Barsavage was inattentive while passing the truck. She did slow while on the shoulder, but tried to reenter the highway too quickly, instead of attempting a gradual reentry. Again, using the Clement standard, we assign 30% of the fault to Ms. Barsavage. See Clement v. Frey, 95-1119, 95-1163 at p. 7-8, 666 So.2d at 611; Guidroz, 94-0253 at p. 4-5, 648 So.2d at 1364-65.
DAMAGES: DUTY TO MITIGATE
An injured party has a duty to mitigate his or her own damages. Aisole v. Dean, 574 So.2d 1248, 1253-54 (La.1991). An injured party is required to take reasonable steps to exercise ordinary prudence to minimize the damage. Stanley v. Guy, 442 | i2So.2d 579, 582 (La.App. 1st Cir.1983). In order to minimize damage, an injured party is obligated to submit to reasonable medical treatment recommended for the party’s improvement. Reeves v. Louisiana and Arkansas Railway Co., 304 So.2d 370, 375 (La.App. 1st Cir.), writ denied, 305 So.2d 123 (La.1974).
Ms. Barsavage asserted not only her inability to work as a result of the accident, but also complained that her physical limitations impacted her life with her children. Her claim for mental anguish was based on her inability to support herself and her children, and her sometime inability to meet the physical demands of parenthood. DOTD argued that Ms. Barsavage failed to mitigate her damages.
Ms. Barsavage suffered injuries and testified that she was unable to work after the accident in 1988. At the time of trial, she testified that she had pain from time to time in her neck, but it was “a lot better than what it was in the very beginning.” The pain was brought on by weather changes and stress. Her back was still painful during the trial. She testified that she had back pain every day. Ms. Barsavage stated that she took Advil on a daily basis.
*964 For ten months before the accident, she worked at Omega Optical as a contact lens technician making $5.45 an hour. Sometime after the accident, she gave birth to two children, who were about one and four, at the time of the trial in 1994. Ms. Barsavage tried to return to work in October or November of 1993 at a factory assembly line. She worked for a week and a half, but could not continue because of the pain she experienced on the job. She made no other attempts to find a job. Ms. Barsavage admitted that two physicians, Dr. Whitecloud and Dr. Llewellyn, told her that surgery would alleviate the pain, but she felt that the surgery was optional. She declined to undertake any surgical procedure because the doctors would not give her any guarantees and she did not want to leave her only child at the time to go to the hospital. Ms. Barsavage testified that she was aware of | ^rehabilitation services (many of which were free) in her state of residence, Texas. She had not utilized any of them. Ms. Barsavage testified that she would undergo physical therapy, but she could not afford it. She admitted that she even if she was functionally capable, she would not go back to work until her children were in school. Ms. Barsavage stated that she could not afford day care and believed that it was her responsibility to stay home with her children until they were about five.
On the issue of failure to mitigate damages, the trial court, in its reasons for judgment, noted that Dr. Whitecloud recommended surgery and, based on the normal outcome of the surgery in such a case, forecast no disability and only a 10% physical impairment. A 10% impairment would preclude heavy manual labor, but nothing else. The trial court noted that Dr. Stockton believed that surgery would not have eliminated the disability that prevented Ms. Barsa-vage from working. However, the trial court also stated that Dr. Stockton “testified that surgery would have cut down on the scar tissue and relieved the pain.” According to Dr. Stockton, any future surgery would not reduce the pain as earlier surgery would have. Thus, the trial court found that (1) Ms. Barsavage refused to have surgery and (2) Ms. Barsavage’s condition would have been improved by surgery. The trial court also found that she had not attended any vocational counseling, rehabilitation training, or physical therapy sessions, and many of these services would have been provided to her for free.' In its reasons for judgment, the trial court noted that Ms. Barsavage gave birth to the children after the accident.
We find no manifest error in these findings. However, the trial court, in its award of damages, gave no specific indication of what, if any, reduction it made for Ms. Bar-savage’s failure to mitigate her mental anguish. The trial court made no reduction in the award for past or future lost wages.
On the record before us, we agree with the trial court that Ms. Barsavage failed to adequately mitigate her damages. I i4CertainIy, DOTD met its burden of proof on Ms. Barsavage’s duty to mitigate. The refusal to have surgery obviously interdicted the possibilities of recovery from the injury and of lowering the level of pain. It is undisputed that Ms. Barsavage was injured. The dispute is over her responsibility to seek the highest level of improvement that is reasonable under the circumstances. The question arises of whether DOTD has a duty to pay for lost wages Ms. Barsavage suffered as a result of her choice of treatment.
Counsel for Ms. Barsavage argues that the surgery was optional and, therefore, she was not required to undergo surgery to mitigate her damages. It is clear from the medical depositions that Ms. Barsavage was offered options, but unequal options. The choices offered her by Doctors Llewellyn and Jarrott were conservative treatment versus surgery. Conservative treatment required her to accept severe restrictions on activities and rendered her unemployable. Surgery within a reasonable time after the accident offered a high probability of recovery sufficient to return her to the work force and allow light and moderate activity. Except in emergency situations, doctors do not force surgery on anyone. Ms. Barsavage exhibited throughout her treatment a persistent refusal to follow the advice of her physicians and present herself for evaluation or treatment. Thus, she has a shown consistent disregard for mitigation of damages.
*965 All the doctors testified that surgery would. have improved Ms. Barsavage’s condition. The disagreement was over the level of improvement after surgery. Dr. Whitecloud; Dr. Llewellyn, and Dr. Jarrott believed that after surgery, Ms. Barsavage would have had to refrain from heavy manual labor, but would have been able to work. The only treating physician that testified, Dr. Llewellyn, stated that Ms. Barsavage would be eighty percent comfortable eighty percent of the time, be able to return to light work, and moderate activities. Dr. Whitecloud forecast an even greater level of recovery. Dr. Stockton believed that Ms. Barsavage would still have been disabled to some extent after earlier surgery, |lsbut admitted that the pain would have been significantly reduced. Tulane Medical Center was willing to do the surgery under the Medicaid program. In fact, surgery was scheduled and preparations made, but Ms. Barsavage did not show up.
Ms. Barsavage also refused physical therapy, but for a good reason; she could not afford it at the time. On the other hand, she did not avail herself of the Texas rehabilitation services that may have been able to provide free or low cost therapy.
After the accident, Ms. Barsavage made no attempt to find a job in her previous field of employment. No one claims that the job of optical technician required the type of activity found in the only job she did attempt post-injury in 1993, that of an assembly line worker. Ms. Barsavage made the decision to have two children, ■ after she knew that her injury was interfering with her ability to work. She also admitted that she believed that it was her duty to stay home to care for the children until they were of school age. Many women today may share Ms. Barsa-vage’s view toward child rearing, and wish to stay home. However, monetary concerns, which affect the children’s welfare, often demand that the mother seek employment before the children are of school age.
For these reasons, we find that the trial court abused its discretion in not sufficiently reducing the award for mental anguish and in not reducing the award for lost wages and earning capacity. See State, Department of Social Services ex rel. Harden v. Southern Baptist Hospital, 94-2228, 94-2229 p. 11-12 (La.App. 4th Cir. 10/12/95), 663 So.2d 443, 451, writ denied, 95-2751 (La.1/26/96), 666 So.2d 676; Coffin v. Board of Supervisors of Louisiana State University Agricultural and Mechanical College, 620 So.2d 1354, 1366-67 (La.App. 2d Cir.1993); Burke v. Safeway Stores, Inc., 554 So.2d 184, 190 (La.App. 2d Cir.1989). Although Ms. Barsavage would have experienced some lost wages and mental anguish from the injury to her neck and back, the awards did not adequately reflect the significance of her failure to Lamitigate her damages. Based on the record, proper rehabilitation after surgery, undertaken a short time after the accident, with or without vocational training, would, in all probability, have enabled Ms. Barsavage to return to gainful employment and to better meet the physical demands of parenthood. See Pisciotta v. Allstate Insurance Company, 385 So.2d 1176, 1181-82 (La.1979) (On Rehearing (La.1980), the Louisiana Supreme Court affirmed original opinion on issue of mitigation, reversed on another issue). By returning to employment that met her restrictions, she would have • eliminated the feelings of inadequacy that she experienced.
For the sake of argument, even if the surgery had been offered as an equal option to more conservative treatment, Ms. Barsa-vage made no attempt to resume employment in her field or take advantage of free counseling and vocational training available to her. Dr. Llewellyn encouraged her to resume certain activities and to return to light work as early as 1989. She may have been able to perform at an adequate level, but the defendant was deprived of this information by her own refusal to attempt to find suitable employment at her former level or at minimum wage.
The only just result on the record before us is to reduce the amount for mental anguish to one-half of that awarded by the trial court, and to reduce the amount of lost wages to three-fourths of the trial court’s award. That is, an award of $29,940.50, or between two and three years salary based on the figures calculated by Dr. Randolph Rice' and utilized by the trial court. That is the *966 approximate period of time from the accident until the termination of treatment with Dr. Llewellyn and Dr. Jarrott by Ms. Barsavage.
The record contains no support for an award for future surgery. We find no evidence in the record that a particular surgery would be successful many years after the accident or that Ms. Barsavage would actually undertake a specific surgical resolution in the near future. This is especially true in light |17of Dr. Stockton’s testimony and Ms. Barsavage’s refusal to undertake any previous recommendation for surgery. Thus, we find that the award of $30,000 for surgery was far too speculative on the record, and must be deleted.
CONCLUSION
For these reasons, we reverse the judgment on the apportionment of fault. The fault is apportioned 70% to DOTD and 30% to Ms. Barsavage. We amend the judgment, as follows:
(1) the award for mental anguish is reduced from $25,000 to $12,500;
(2) the award for past and future lost wages is reduced from a total of $239,-524 ($60,900 for past lost wages and $178,624 for future lost wages) to $29,-940.50; and
(3) the amount of $30,000 for future surgery is deleted from the award for future medical expenses.
The total amount of damages, before apportionment, now equals $182,654.58. We affirm the judgment in all other respects. The costs of the trial court, $865.90, are assessed to DOTD. The costs of the appeal, $400, are assessed equally to Ms. Barsavage and the DOTD.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
WHIPPLE, J., concurs.

. To request modification or reversal of a portion of a trial court’s judgment, an appellee must answer the appeal. LSA-C.C.P.art. 2133. In Ms. Barsavage’s answer she did not request a review of the damages. However, in the conclusion of her appellee brief, Ms. Barsavage requests this court to review the assessment of damages in accordance with the evidence. In response to the appeal by DOTD, we reviewed all damages, except pain and suffering and medical expenses, minus the future surgery award. Although we do feel compelled to undertake such a review based only on the one sentence request in the appellee brief, we find that the record does not support any increase in the damages. Certainly, the trial court did not abuse its vast discretion in its award of damages for pain and suffering or err in its award of medical expenses, with the exception of the future surgery award.