691 So.2d 177 (1997)
Morris R. HARDENSTEIN, et al.
v.
COOK CONSTRUCTION, INC., et al.
No. 96 CA 0829.
Court of Appeal of Louisiana, First Circuit.
February 14, 1997.
Writ Denied April 25, 1997.
*179 David R. Paddison, Covington, Jacques F. Bezou, Mandeville and Lee A. Archer, Lake Charles, for Plaintiff-Appellant, Morris R. Hardenstein.
Richard P. Ieyoub, Attorney General, Baton Rouge, and Nel F. Vezina, Andree M. Cullens, Vezina and Gattuso, Gretna, for Defendant-Appellee, State of Louisiana, Department of Transportation and Development.
Before CARTER, LeBLANC and PARRO, JJ.
PARRO, Judge.
This is an appeal from a trial court's judgment that dismissed the personal injury *180 claims of plaintiff Morris R. Hardenstein ("Hardenstein"). We affirm.

FACTS AND PROCEDURAL BACKGROUND
As noted by the trial court in written reasons for judgment, the facts of this case are relatively undisputed. A single-vehicle accident occurred about 8:30 a.m. on January 25, 1989, while Hardenstein was driving his Toyota pickup truck on Interstate Highway 12 ("I-12") between Mandeville and Slidell. Keith Haydel ("Haydel") was a passenger in the truck. It was daylight, the weather was clear, and the road was dry and unobstructed. The highway was being re-surfaced and was awaiting a final layer of asphalt, however no construction work was being done in the vicinity on the day of the accident. Warning barrels and signs were present and the posted speed limit for the construction area was 45 m.p.h. The center line had temporary marking in place, but there was no edge striping delineating the roadway from the shoulders. The surface of the travel lanes was even with the right and left shoulders, but there was a height differential ("drop-off") of several inches between the left shoulder and the grassy median.
Hardenstein testified he was traveling with the flow of traffic and estimated his speed was at least 65 m.p.h. He passed a car driven by Clyde Dykes ("Dykes") and pulled back into the right lane directly behind an eighteen-wheeler. But because the large truck was blocking his view of the highway, Hardenstein immediately pulled back into the left lane to pass it. While passing the truck, he drove over the left travel lane, across the four-foot-wide shoulder, and beyond the shoulder into the median. Hardenstein testified he felt the jolt of a drop-off as his tires left the shoulder. He drove 200-300 feet in the median, apparently without slowing his vehicle at all, and when he had almost passed the eighteen-wheeler, steered to the right to reenter the highway. Seeing the small truck coming, the driver of the eighteen-wheeler, Steve Milton ("Milton"), braked hard to avoid hitting it. Hardenstein's pickup truck bumped back over the drop-off at high speed, traveled all the way across the highway over both lanes of traffic, crossing just in front of the eighteen-wheeler, and ran completely off the ten-foot-wide right shoulder onto the embankment. Hardenstein then turned his wheels abruptly to the left to get back on the road. However, at this point, the truck flipped over. Hardenstein was thrown from the vehicle and broke his back. As a result of his injuries, he was rendered a paraplegic. His passenger remained in the truck and was not seriously injured.
Hardenstein filed this lawsuit against the State of Louisiana, Department of Transportation and Development ("DOTD") and against the contractor for the highway repair, Cook Construction Company, Inc. and its liability insurers ("Cook").[1] He contended both had a duty to keep the highway and shoulders safe for the motoring public during the construction project, and that their failure to do so caused his injuries. He claimed the lack of temporary edge striping and the drop-off between the shoulder and the median caused the accident; had the left edge of the travel lane been marked, he would have known where it ended and would not have driven across the left shoulder into the median. Also, he contended if there had been no drop-off between the shoulder and the median, he could have maintained control of his truck upon reentering the highway.
After hearing all of the evidence at trial, the trial court disagreed, concluding that Hardenstein's own actions were the sole cause of the accident and his resulting injuries. The court found the drop-off from the shoulder to the median was approximately 3-4 inches. The court noted there were no reported cases concerning a drop-off between the shoulder and median, although there were many dealing with uneven lane surfaces or height differences between the travel lanes and shoulders. Acknowledging that DOTD had a duty to keep the roads and shoulders safe for the driving public, the *181 court looked also to the duty of the driver to exercise reasonable care while driving and to keep a proper lookout for observable hazards. The court reviewed cases suggesting that DOTD's burden is somewhat lighter when temporary conditions exist as a result of road repair, while the driver's duty to exercise caution is heightened by such conditions. The court implicitly found DOTD had fulfilled its duty of making drivers aware of potential problems in the construction area, noting its use of appropriate warning signs and barrels, as well as a lower posted speed limit. Hardenstein, on the other hand, although he was familiar with the road and knew it was under construction, was exceeding the posted speed limit by at least 20 m.p.h., was talking with his passenger before attempting to pass the eighteen-wheeler, did not slow down while in the median, and ignored Haydel's warning to him in the median that he should not try to reenter the highway. Given these facts, the court concluded the drop-off was not "a vice or defect sufficient to have been a cause in fact of this accident."
Similarly, the court noted there was no case law regarding the presence or absence of temporary edge striping between the roadway and the shoulder, nor was it required by any of the standards and specifications in effect for highway construction in Louisiana. Focusing again on Hardenstein's actions, the court noted these exhibited his "total disregard of his duties as a driver." If he had been observing the speed limit and the road, he could easily have seen he was approaching the median and could have avoided entering it. While expressing sympathy for the tragic consequences of the accident, the court found Hardenstein's actions and reactions were the cause of the accident, and "the lack of edge striping between the roadway and shoulder was not a vice or defect sufficient to have been a cause in fact of this accident." The court found DOTD had no liability to Hardenstein under the facts of this case, and dismissed his claims with prejudice in a judgment signed November 21,1995.[2]
Hardenstein appealed, claiming the court's conclusions regarding the cause in fact of the accident were clearly wrong because the lack of temporary edge striping and the drop-off between the shoulder and median, along with a failure to warn of these conditions, were contributory causes of his accident. He also contends these highway conditions were vices or defects which DOTD knew about and failed to correct. Because the trial court found DOTD had no liability, it did not award damages; Hardenstein assigns this failure as additional error.
Additionally, in connection with the temporary edge striping, Hardenstein tried to introduce a report prepared by an engineer with the Federal Highway Administration as a result of his inspection of the project. That report described several conditions, including the lack of temporary edge striping, as deficiencies which should be remedied. Based on a federal statute, 23 U.S.C.A. § 409, the trial court granted DOTD's motion in limine and excluded any documents falling within the ambit of the statute. At trial, the court concluded the federal inspection report was covered by that statute and could not be admitted, but allowed a proffer of this document. Hardenstein assigns the court's decision to exclude the report as error and urges this court to consider this inspection report as evidence that the lack of edge striping was a vice or defect and that DOTD knew about the problem, but did not correct it. We will address this contention before evaluating the substantive claims asserted by Hardenstein in this appeal.[3]

*182 ADMISSIBILITY OF FEDERAL INSPECTION REPORT
The highway construction project which was under way on I-12 when this accident occurred was partially financed with federal highway funds, and the inspection report at issue was an evaluation of the progress of that ongoing project. As such, DOTD arguedand the trial court agreedthat the provisions of 23 U.S.C.A. § 409 were applicable to shield it from admission into evidence in this case. That statute states:
Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying[,] evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.
23 U.S.C.A. § 409 (West 1996).
The applicability of this statute to cases involving federally-funded highway projects in Louisiana was first addressed by the Louisiana Supreme Court in Wiedeman v. Dixie Elec. Membership Corp., 627 So.2d 170 (La. 1993), cert. denied, 511 U.S. 1127, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994).[4] The court there noted that the "explicit preemptive language" of the federal statute would override conflicting state law by virtue of the Supremacy Clause, U.S. Const. Art. VI, cl.2. Wiedeman, 627 So.2d at 172. The court held that section 409 created a privilege for compilations enumerated in the statute, but that privilege did not extend to reports and data gathered for or incorporated into such compilations. Wiedeman, 627 So.2d at 173. Accordingly, although "raw data" collected by DOTD was discoverable and admissible, "compilations made for developing highway safety construction projects which would utilize Federal-aid funds" were not. Id. In Doucet v. Champagne, 94-1631 (La.App. 1st Cir. 4/7/95), 657 So.2d 92, writs denied, 95-1759, 95-1887 (La.11/3/95), 661 So.2d 1379, cert. denied, ___ U.S. ____, 116 S.Ct. 1353, 134 L.Ed.2d 522 (1996), this court noted that, according to Weideman, "section 409 protects documents involving actual construction projects ..." in addition to the enumerated compilations. Doucet, 657 So.2d at 95.
When analyzed by the Louisiana Supreme Court in Wiedeman and when applied by the trial court during the trial of this case, § 409 did not contain the words "or collected," which were added in a 1995 amendment. Pub.L. 104-59, Title III, § 323, Nov. 28, 1995, 109 Stat. 591. The recent case of Palacios v. Louisiana and Delta Railroad, Inc., 96-292 (La.App. 3rd Cir. 10/17/96), 682 So.2d 806, writ granted, judgment vacated, 96-2756 (La.1/10/97), 685 So.2d 132, examined the issue of whether the addition of these two words in 1995 shielded even "raw data" from discovery and admission into evidence. The third circuit concluded that the Wiedeman case was unaffected by the amendment. However, the Louisiana Supreme Court recently vacated the Palacios judgment and remanded the case to the trial court to determine which, if any, of the requested documents could still be discovered after the amendment of § 409. Although not spelled out by the court, the implication may be that even some "raw data" collected in connection with federally funded highway projects is shielded from discovery.
Applying these standards to the inspection report prepared by an engineer employed by the Federal Highway Administration, we find no error in the trial court's exclusion of that document. The report was an evaluation of an ongoing highway safety construction improvement project which used *183 federal highway funding. It was more than "raw data," because it also contained the opinions and recommendations of the inspector. Accordingly, the trial court was correct in concluding it could not be admitted.

APPLICABLE LAW
Hardenstein's claims against DOTD were based on theories of negligence and/or strict liability. To determine liability under traditional negligence principles, the "duty-risk" analysis is appropriate, which includes four basic inquiries:
1. What, if any, duties were owed by the respective parties?
2. Were the requisite duties breached?
3. Was the conduct in question a cause in fact of the resulting harm?
4. Was the risk and harm caused within the scope of protection afforded by the duty breached?
Faucheaux v. Terrebonne Consolidated Gov't., 615 So.2d 289, 292 (La.1993).
Using another way of examining liability which developed from the strict liability analysis, the plaintiff has the burden of proving that (1) the thing which caused the damages was in the "custody" of the defendant, (2) the thing was defective because it had a condition that created an unreasonable risk of harm (breach of duty), and (3) the defect in the thing was a cause in fact of the resulting injury. Guzman v. State, 95-0957 (La. App. 1st Cir. 12/15/95), 664 So.2d 1343, 1348.
Liability based on negligence under Louisiana Civil Code article 2315 can only be imposed when a defendant is actually or constructively aware of a hazardous condition and fails to take corrective action within a reasonable time. Ryland v. Liberty Lloyds Insurance Co., 93-1712 (La.1/14/94), 630 So.2d 1289, 1300. In contrast, strict liability pursuant to Louisiana Civil Code article 2317 generally does not require proof that the defendant had knowledge of the vice or defect. Guzman, 664 So.2d at 1347. However, for a public entity owner or custodian, such as DOTD, that difference was eliminated by the legislature's enactment of LSA-R.S. 9:2800(B), under which proof is required of actual or constructive knowledge of a vice or defect and failure to remedy it within a reasonable period of time. Id. As a result of this statute, when the issue is whether a public entity has breached its duty and is liable for damages, the analysis of this factor regarding knowledge is the same under negligence or strict liability.
Under both theories, cause in fact is essential to the assessment of liability. Huddleston v. Ronald Adams Contractor, Inc., 95-0987 (La.App. 1st Cir. 2/23/96), 671 So.2d 533, 536. Cause in fact is a "but for" inquiry; if the plaintiff probably would not have sustained the injuries, but for the defendant's substandard conduct, such conduct is a cause in fact. Faucheaux, 615 So.2d at 292. To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Id. Cause in fact is a factual question to be determined by the fact finder. Cay v. State, Dept. of Transp. and Dev., 93-0887 (La.1/14/94), 631 So.2d 393, 395-96.
Duty is a question of law. The inquiry is whether the plaintiff has any law statutory, jurisprudential, or arising from general principles of faultto support his claim. Faucheaux, 615 So.2d at 292. Under both negligence and strict liability theories, the duty owed by DOTD is the same. Huddleston, 671 So.2d at 536. The duty of DOTD is to keep the highways and shoulders in reasonably safe condition, and encompasses the risk that a careless motorist might unexpectedly stray onto the shoulder of the highway. Orillion v. Carter, 93-1190 (La. App. 1st Cir. 6/24/94), 639 So.2d 461, 465, writ denied, 94-2289 (La.11/18/94), 646 So.2d 384. Included in DOTD's obligation is the duty of properly signing and marking highways to alert unwary drivers to unusually perilous hazards. Forest v. State, Through Louisiana Dept. of Transp. and Dev., 493 So.2d 563, 570 (La.1986). Because of the necessity for construction work to maintain the highways, and the fact that such work often involves temporary hazards, the standard of care in a construction area is lower; nevertheless, there is a duty to warn motorists of dangerous construction conditions. Huddleston, 671 So.2d at 537. Warnings *184 should be sufficient to alert the ordinary, reasonable motorist, having in view the probable traffic, the character of the road, and the use reasonably to be anticipated. Id.
However, the state, through DOTD, is not a guarantor of the safety of travelers. Ryland, 630 So.2d at 1300. Its duty does not extend to a motorist who has knowledge of a highway defect and a reasonable opportunity to avoid the harm. Orillion, 639 So.2d at 465. A motorist has a duty to keep his vehicle under control at all times. Sinitiere v. Lavergne, 391 So.2d 821, 826 (La.1980). Prudent behavior for a motorist who inadvertently drives off the paved roadway onto the shoulder is first to reduce speed and then to attempt a gradual reentry after the motorist has regained control of the vehicle. Guidroz v. State, Through Dept. of Transp. and Dev., 94-0253 (La.App. 1st Cir. 12/22/94), 648 So.2d 1361, 1364.
A vice or defect is some flaw or fault inherent in the thing itself that creates an unreasonable risk of harm to another. See Guzman, 664 So.2d at 1348. In both negligence and strict liability cases, the reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Nicholes v. St. Helena Parish Police Jury, 604 So.2d 1023, 1027 (La.App. 1st Cir.), writ denied, 605 So.2d 1378 (La.1992). The court must decide if the risk which causes the injury is within the ambit of protection of the duty. Orillion, 639 So.2d at 465.
The appellate court's review of factual findings is governed by the manifest errorclearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

ANALYSIS
With these precepts in mind, we examine the trial court's findings and conclusions in this case. The court found, and the parties do not contest, that DOTD had custody and control of the section of I-12 where the accident occurred. Accordingly, DOTD had a duty to keep this section of the highway, including the travel lanes and shoulders, in a reasonably safe condition, and to post appropriate warnings concerning any potentially hazardous conditions in the construction zone.
There are three conditions that, Hardenstein argues, created an unreasonable risk of harm to him, and were therefore vices or defects. These include the lack of temporary edge striping, the drop-off between the shoulder and the median, and the lack of warning signs indicating the existence of these conditions. He also contends these conditions caused his accident.

Temporary Edge Striping
Every case must be examined on its own facts. The accident report indicated this accident occurred on a clear morning on a straight, dry stretch of highway where there were no obstacles to visibility. The highway had just been re-surfaced across both travel lanes and the left shoulder, so there were no potholes, bumps, or uneven places in the roadway or shoulder. The center line was marked with white dashes. None of the witnesses indicated that there was any traffic obstructing Hardenstein's view of the highway once he proceeded into the left lane to pass the eighteen-wheeler. Hardenstein admitted there was ample room in the left *185 travel lane for him to pass the eighteen-wheeler without straying onto the left shoulder or median, and he offered no explanation for this occurrence. Beyond the travel lane on the left was an additional four feet of shoulder before the grassy median began. Even if Hardenstein could not tell precisely where the travel lane ended and the shoulder began, the photographs of the accident scene show that the demarcation between the paved portion of the roadway and the grassy median was clearly visible. Under these circumstances, the trial court certainly had a reasonable factual basis for concluding that the lack of temporary edge striping was not a defect.
Hardenstein's reliance on Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, is misplaced. The roadway in that case was a narrow, curving, two-lane road with no edge striping and shell shoulders ranging from one to three feet in width, sloping down to the Chacahoula Swamp on either side. There were ruts in the shoulder itself, alongside the edge of the paved surface, which had been there for months. At the time of the accident, the roadway was wet. The defective condition of that roadway involved a combination of factors, none of which are present in the instant case, except for the lack of edge striping. Additionally, Hardenstein argues that DOTD admitted the lack of edge striping was a safety hazard when, responding to the federal inspection, it requested Cook to provide temporary edge striping and other improvements as "safety corrections." The fact that DOTD was taking steps to make the construction zone more safe does not prove that the condition of the highway, before those additions, was unsafe.
Weighing the probability and magnitude of the risk against the utility of the thing, we note that the most probable result of a lack of temporary edge striping between the roadway and the shoulder is that a driver will move beyond the normal travel lane. In this case, the entire paved surface was even, so this would not be likely to cause injury. Even if an inattentive driver proceeded into the median, that area in this case was a relatively flat, grass-covered surface, which would not present a hazard to a driver. Therefore the probability and magnitude of the risk is slight. The utility of temporary edge striping is that it does delineate the travel lane from the shoulder, which can be particularly helpful at night or in stormy weather. However, it is a temporary measure during construction, and must be re-done when the final layer of asphalt is complete. Under the facts of this case, the trial court's conclusion that "the lack of edge striping between the roadway and shoulder was not a vice or defect sufficient to have been a cause in fact of this accident" is not clearly wrong.[5]
The question of whether the lack of temporary edge striping was a cause in fact of Hardenstein's accident is one of fact. Based on the road and weather conditions described above, the trial court had a reasonable factual basis for finding that the absence of temporary edge striping did not contribute in any way to Hardenstein's accident. Even if we accept Hardenstein's argument that, but for the lack of these marks, he would have realized he was moving from the travel lane to the shoulder, it was not this movement which was causally connected to his accident. He did not encounter anything on that shoulder which caused him to lose control. Additionally, Hardenstein did not need edge striping to see where the paved portion of the road ended and the median began. Nor did he encounter anything in the grassy median which was a causative factor. The truck and its occupants were perfectly safe in that median and nothing about that location caused any damage to them. A photograph of the accident scene shows the tracks of the pickup truck in the grassy median were straight and even. The officer who investigated this accident, Louisiana State Police Sgt. Louis K. Ogle, Sr. ("Sgt.Ogle"), stated that from the configuration of these parallel *186 tire tracks, it appeared that the truck was not out of control while in the median. The trial court's conclusion that the lack of temporary edge striping did not have anything to do with this accident is not clearly wrong, under all of the circumstances of this case.

Drop-off between Shoulder and Median
Hardenstein also contends the drop-off between the shoulder and the median was a vice or defect. The trial court found there was a drop-off of 3 to 4 inches between the edge of the left shoulder and the grassy median.[6] This finding is supported by the testimony of Sgt. Ogle, who stated that although he did not measure the drop-off while investigating the accident, he noticed it and estimated its depth as 3 to 4 inches. Joel McWilliams, who was the engineer serving as project manager for DOTD, testified that the resurfacing of the shoulder only involved adding 2 inches of asphalt to it, which should not have caused any hazard. In contrast, Haydel and Hardenstein testified they thought the drop-off was 6 to 8 inches. However, neither of them closely examined the area or measured the drop-off, either before or after the accident. One of the photographs of the accident site shows the grassy median and the left edge of the paved surface. The drop-off is visible in the photograph, and the paved surface appears to be several inches higher than the median surface, but certainly does not appear to be 6 to 8 inches higher. The trial court could reasonably rely on the testimony of Sgt. Ogle, as he was an independent observer and the only witness who walked the area immediately after the accident. The court's finding that the drop-off was 3 to 4 inches is supported by a reasonable factual basis and is not manifestly erroneous.
The first issue is whether this 3 to 4 inch drop-off between the shoulder and the median presented an unreasonable risk of harm, and could therefore be considered a vice or defect in the highway. As noted by the trial court, there are numerous cases which consider drop-offs between the roadway and the shoulder and the resulting liability of DOTD. This court has also noted the jurisprudence which has consistently held that an abrupt drop-off between a roadway and a shoulder constitutes a defect. See Guzman, 664 So.2d at 1348-49, and cases cited therein. However, the trial court also noted that a distinguishing feature of this case is that there was a smooth transition between the roadway and the shoulder; the 3 to 4 inch drop-off was between the shoulder and the median. The purpose of the shoulder is to provide a connection between the roadway and the shoulder which allows a safe, gradual movement from one to the other. Sinitiere, 391 So.2d at 825. That purpose was met in this case. And even if one were to argue that the grassy median serves a similar purpose as the shoulder, based on the photographic evidence of this accident site, the trial court could reasonably have concluded that it was also possible to safely return to the paved surface from the median.
That was clearly not possible in a recent case relied on by Hardenstein to support his claim that this drop-off was a vice or defect. In Barsavage v. State, Through the Dept. of Transp. and Dev., 96-0688 (La.App. 1st Cir. 12/20/96), 686 So.2d 957, the plaintiff's tire blew out as she attempted to regain the paved surface, flipping her vehicle and causing her injuries. The case bears some similarities to the case before this court, in that the accident occurred in a construction area where the highway had been resurfaced, the edge stripes were not in place, and the paved surface dropped off several inches to the "dirt shoulder" on the left.[7] However, a key *187 factor in the case was the "pitch black" darkness of that particular stretch of the highway on the night the accident occurred. Moreover, independent witnesses in the Barsavage case testified that there were no warning signs or barricades in place near the accident site to alert a driver to a construction zone, and this court found no support in the Barsavage record for the trial court's finding that DOTD had met its duty to adequately warn of construction hazards. This court also found no support in that record for the trial court's finding that the drop-off was only 1 to 2 inches. None of the witnesses testified to such a shallow differential and a truck driver who witnessed the accident checked the edge of the highway where the tire blew out and found an 8-inch differential between the two surfaces at that point. This court also emphasized the "peculiar circumstances" of the case, in that the section of highway where the Barsavage accident occurred was extremely dark, making it very difficult to distinguish between the paved surface and the dirt shoulder. Also, the actions of the plaintiff in that case differed markedly from Hardenstein's actions. There the plaintiff, who was not familiar with the highway, was glancing in her rear view mirror to check the position of the truck she was passing when she felt her left tires leave the paved portion of the highway. The unpaved "dirt shoulder" was very bumpy, making it difficult to control her car, so she slowed down before trying to bring her left wheels back onto the highway. Despite her caution, the drop-off was such that when her tire hit the edge of the highway, the drop-off itself caused the tire to blow out.
Each case must be examined under its own unique set of factual circumstances. A condition which might create an unreasonable risk of harm in one factual situation may not present the same risk in other circumstances. In the instant case, the edge of the paved surface and the height difference were clearly visible; it was highly unlikely that any driver would run over the drop-off into the median. A photograph of the accident site shows the grassy median was quite level, unlike the bumpy dirt shoulder encountered by the driver in Barsavage. Also, there was no evidence that this drop-off was so high that it presented a risk of damage to a vehicle, and in fact the truck was not damaged when it encountered the drop-off in either direction. Under these facts, the probability and magnitude of the risk in encountering this drop-off was low, and it was more than outweighed by the utility of the conditions. The build-up of the roadway and shoulder with a new layer of asphalt was necessary to ensure a safe and level driving surface. During this process, it was inevitable that at certain times during the construction project, there would be differences in height between the travel lanes, between the travel lanes and shoulder, and between the shoulder and the median. The trial court was not clearly wrong in concluding that, under the circumstances of this case, the 3 to 4 inch drop-off between the shoulder and the median was not a vice or defect.
We also agree with the trial court's determination that this drop-off was not a cause in fact of Hardenstein's accident, but that the accident was caused solely by his own negligence. Although Hardenstein testified he was traveling with the flow of traffic, the record shows he was overtaking and passing other vehicles. Hardenstein passed Dykes going 65 m.p.h. and was trying to pass Milton's truck at "maybe slightly over sixty-five..." when he ran off the road. Hardenstein knew the area was under construction; he had seen the signs and knew he might encounter hazardous conditions. He testified this was the reason he wanted to pass the eighteen-wheeler, stating, "I was trying to pass, but I couldn't see what was in front of me because if there [sic] were doing road construction I wanted to, you know, be able to see it beforehand, you know, and I couldn't see behind the truck." More significantly, Hardenstein knew there was a drop-off on the left side of the road. He testified that he observed it before his accident, stating, "Well, I looked at it, you know, ... before my accident and it looked fairly high." Yet he swung so far to the left as he passed *188 the truck that his truck went into the median.
Hardenstein did more than just slip off the pavement with his left wheels; he drove his entire vehicle into the median, where a photograph in the record shows it was at least a car's width away from the paved surface. Both he and Haydel testified they felt a jolt when the truck left the paved surface, so he clearly became aware of the drop-off at that time. But he did not slow down; instead he continued at a speed in excess of 65 m.p.h., still trying to overtake and pass the eighteen-wheeler. Sgt. Ogle testified he estimated the pickup truck traveled "between two and three hundred feet in the median from the time he went off to the time he came back." Then despite Haydel's warning to him not to try to get back on the highway under these circumstances, he swung back to the right and ran over the drop-off again to get back on the paved surface.
Although Hardenstein argues this second encounter with the drop-off was the reason he lost control, there certainly is a reasonable factual basis for the trial court's conclusion that his reckless driving, not the drop-off, was the cause of his accident. From the photographs in the record and the testimony of the other witnesses, it appears the truck reentered the highway at approximately a 30° angle and continued at that angle all the way across the highway. It does not appear from the photographic evidence, and none of the witnesses testified, that the truck's forward momentum changed in any way when it went back over the drop-off. Also, the truck was not damaged at that point.
As the truck hurtled across the highway in front of the eighteen-wheeler, Hardenstein testified he remembered, "seeing some trees, heading for some trees and cutting my wheel so I didn't hit the trees and the next memory I have is laying [sic] on my back...." Haydel confirmed that just before the truck flipped over, Hardenstein jerked the steering wheel back toward the left. Hardenstein apparently never applied his brakes. Although the photographs clearly show the marks on the asphalt where the eighteen-wheeler "locked his brakes," there are no brake marks anywhere from Hardenstein's truck. The trial court did not err in concluding that Hardenstein's own actions and reactions, not the drop-off between the shoulder and the median, were the cause of his injuries.

Warning Signs
Hardenstein's final argument is that DOTD breached its duty to him by failing to adequately warn of the hazardous conditions of the highway. This argument has no merit, first because we have already determined that the trial court correctly found the conditions of the highway when this accident occurred were not hazardous. But also, there is ample support in the record for the trial court's finding that warning signs were present, and that these were adequate to put drivers on notice of potentially hazardous conditions. All of the witnesses, including Haydel and Hardenstein, testified that construction warning signs were in place and they knew the highway was under construction. Similarly, all testified that the posted speed limit was 45 m.p.h. throughout the construction area. These warnings were adequate under the circumstances of this case.

CONCLUSION
As noted by the trial court, the duty of DOTD does not extend to a motorist who knows about a highway defect and has a reasonable opportunity to avoid the harm, but fails to do so. Here, Hardenstein could have avoided this tragic accident by driving at a more reasonable speed, as posted, through this construction zone. He knew there was a drop-off and could see where the edge of the highway was, but carelessly drove over it anyway. His truck was not damaged at that point and he still had control of the vehicle, and again he could have avoided any injuries by slowing down. Instead, ignoring his friend's warning, he drove back onto the highway into the path of an oncoming eighteen-wheeler at high speed. His own reckless actions placed him in a dangerous situation that DOTD could not conceivably have prevented. Accordingly, the trial court's judgment, dismissing Hardenstein's claims with prejudice, is affirmed.
*189 All costs of this appeal are assessed against Hardenstein.
AFFIRMED.
NOTES
[1] Cook settled all of Hardenstein's claims against it prior to trial, but took part in the trial as a party defendant to an intervenor's claims against it for reimbursement of medical expenses paid to or on behalf of Hardenstein. Because the intervention was filed after Cook's settlement, those claims had not been satisfied out of the settlement funds.
[2] In written reasons for judgment, the court noted that neither DOTD nor Cook were liable to Hardenstein. Because Cook had already settled Hardenstein's claims against it, the judgment correctly dismissed only the claims asserted against DOTD.
[3] Also pending before this court is DOTD's motion to strike a seven-page, single-spaced "Summary of Evidence on Damages" appended to Hardenstein's brief to this court, which exceeds the 25-page limit established in Rule 2-12.2, Uniform Rules of Louisiana Courts of Appeal, and also contravenes this court's order of August 24, 1995, which limited attachments to a copy of the judgment and reasons. DOTD's objections are valid; however, in view of our decision in this case, the appendage is irrelevant and we find it unnecessary to rule on this motion.
[4] The trial court's initial ruling on the motion in limine was signed November 13, 1992, before the relevant jurisprudence had developed. However, by the time of the trial, the court had the benefit of the Wiedeman decision and relied upon it in concluding that the inspection report was inadmissible.
[5] Because of the wording used by the trial court in written reasons for judgment, it appears he concluded there was no vice or defect in the highway, and that the conditions of the highway which form the basis of Hardenstein's complaints were not causes in fact of the accident. Accordingly, we will review both of those conclusions, although if either is correct, there is no liability.
[6] In written reasons for judgment, the trial court stated, "The drop off from the shoulder to the median was approximately 3 to 6 inches." However, in another section of those written reasons, this condition is described as "a 3 to 4 inch drop off only from the shoulder to the median." And after summarizing the testimony of the investigating police officer, who estimated the drop-off as 3 to 4 inches, the court stated, "Significantly, no evidence was presented that this measurement was in error or that such a measurement exceeded any standard for safety." Accordingly, we conclude that the trial court's finding on this condition was that there was a 3 to 4 inch drop-off between the shoulder and the median.
[7] In the Barsavage case, the area beyond the pavement is referred to as the "dirt shoulder." Yet, based on the testimony of the DOTD project manager in that case, it appears the roadway actually had a four-foot paved shoulder beyond the travel lanes, with a dirt shoulder beyond the pavement in the same location as the grassy median in the instant case.