PARRO, J.
|gIn this wrongful death and survival action arising out of an automobile accident, the defendant appeals the assignment of 30% fault to it, the plaintiffs appeal the quantum of wrongful death damages awarded, and the intervenor seeks an increase in the amount awarded *692 to it for its workers’ compensation lien. We amend the judgment and affirm it as amended.
BACKGROUND
Michael Moss was killed in an automobile accident in December 1997. His wife, Julia Moss, and his two children, Caitrin H. Moss and Sean M. Moss, filed suit against the State of Louisiana, through the Department of Transportation and Development (DOTD), alleging that when the non-party tortfeasor, Juanita Smith, crossed the center line and headed toward him, Moss had no safe shoulder area to go to in order to avoid the collision. Both Smith and Moss were pronounced dead at the scene of the accident[2] After a trial, a jury found Smith was 70% at fault and DOTD was 30% at fault in the accident. The jury awarded $25,000 in survival damages for Moss’s pain and suffering before he died. It awarded Julia wrongful death damages in the amount of $20,000, loss of support in the amount of $984,000, and funeral and burial expenses in the amount of $10,715. The jury also awarded each of his children $20,000 for wrongful death damages and $100,000 for loss of support. The plaintiffs appeal the amount of the wrongful death damage awards, which they contend were abusively low.
Moss was in the course and scope of his employment with Acadian Ambulance Services, Inc. (Acadian) when he was killed. As its workers’ compensation insurer, Louisiana Workers’ Compensation Corporation (LWCC) paid Julia death benefits of $227,250. LWCC intervened for reimbursement, and the court recognized a workers’ compensation lien in favor of LWCC in the amount of 30% of $227,250 as of March 25, 2005, to be paid on a priority basis out of the proceeds of the judgment in favor of the plaintiffs. LWCC appealed, claiming the judgment was contrary to a stipulation entered into between the parties that agreed to give LWCC the first dollar reimbursement |swithout any reduction for third party fault, and also claiming its lien should not have been reduced by the 70% of fault assessed to the non-party tortfeasor.
DOTD appeals the assignment of 30% fault to it, claiming the evidence shows that Smith suffered from a seizure disorder, had been up all night at a gambling casino boat, and was driving in the wrong lane when her vehicle ran head-on into Moss’s vehicle. It further claims there was no evidence of any material defect in Louisiana Highway 964 (LA 964) where the accident occurred that may have caused her to be driving on the wrong side of the road. DOTD contends that, irrespective of the road’s condition, since Smith was driving on the wrong side of the road, the accident was inevitable. Therefore, DOTD claims the road condition could not have been a cause in fact of the accident resulting in Moss’s death.
LIABILITY OF DOTD
Because our decision concerning the assignment of fault to DOTD may affect the other issues, we will address DOTD’s arguments first. DOTD contends the jury should not have assigned any fault to it. A determination of the allocation of fault by the trier of fact is a factual finding and cannot be overturned in the absence of manifest error. Barsavage v. State, Through Dep’t of Transp. & Dev., 96-0688 (La.App. 1st Cir.12/20/96), 686 So.2d 957, 962, writs denied, 97-0595 and 97-0634 (La.4/18/97), 692 So.2d 455 and 456. The *693 two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trier of fact; and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trier of fact’s finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong. See Stobart v. State, through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993).
Louisiana Revised Statute 9:2800 governs claims against a public entity under LSA-C.C art. 2317, limiting that liability by requiring proof that the public entity had actual or constructive knowledge of the defect and a reasonable opportunity to remedy |4the defect, yet failed to do so. LSA-R.S. 9:2800(C); Henderson v. Nissan Motor Corp., 03-606 (La.2/6/04), 869 So.2d 62, 66. Article 2317.1 requires a similar showing,[3] as do the general negligence principles under Article 2315. Hardenstein v. Cook Constr., Inc., 96-0829 (La. App. 1st Cir.2/14/97), 691 So.2d 177, 183, writ denied, 97-0686 (La.4/25/97), 692 So.2d 1093. Thus, for a plaintiff to succeed in an action against a public entity based on the condition of property for which it allegedly had responsibility, the plaintiff must show that: (1) the property causing the damage was in the custody of the public entity; (2) the property was defective due to a condition that created an unreasonable risk of harm; (3) the public entity had actual or constructive knowledge of the risk; and (4) the defect was a cause in fact of the plaintiffs injury. See Toston v. Pardon, 03-1747 (La.4/23/04), 874 So.2d 791, 798-99; Forbes v. Cockerham, 05-1838 (La.App. 1st Cir.3/7/08), 985 So.2d 86, 97.
DOTD stipulated that it had the care, custody, and control of LA 964 at the time of the accident, December 8, 1997. Therefore, the first requirement of liability is met. However, DOTD contends the record contains no evidence of any defective condition of the highway or shoulder that created an unreasonable risk of harm, and further contends that the condition of the highway was not a cause in fact of this accident.

Unreasonable Risk of Harm

Whether the condition of a road is unreasonably dangerous is a question of fact, and the factual determination should only be reversed if it is manifestly erroneous. Ledoux v. Dep’t of Transp. & Dev., 98-0024 (La.9/18/98), 719 So.2d 43, 44-45. Under this standard, the jury’s findings are reversible only when there is no reasonable factual basis for the conclusions or if they are clearly wrong. Aucoin v. State, through Dep’t of Transp. & Dev., 97-1938, 97-1967 (La.4/24/98), 712 So.2d 62, 65. Neither the trial court nor this court may substitute its evaluation of the evidence for that of the jury unless the jury’s conclusions totally offend reasonable inferences from the evidence or [^unless they are clearly wrong. See Templet v. State ex rel. Dep’t of Transp. and Dev., 00-2162 (La.App. 1st Cir.11/9/01), 818 So.2d 54, 58.
*694 DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. Toston, 874 So.2d at 799. DOTD must also maintain the shoulders and the area off the shoulders, within its right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway, when they are using the area in a reasonably prudent manner. Netecke v. State ex rel. DOTD, 98-1182 (La.10/19/99), 747 So.2d 489, 495. Since 1968, the Louisiana state legislature has required DOTD to design, construct, and maintain all highways in conformity with current AASHTO standards to the extent possible.[4] LSA-R.S. 48:35(A).[5] However, DOTD does not have a duty to bring old highways up to modern AASHTO standards unless a new construction or a major reconstruction of the highway has taken place. Netecke, 747 So.2d at 495. Nevertheless, DOTD does have a duty to correct unreasonably dangerous conditions existing on old highways. Id. And, while failure to adhere to AASHTO standards may not in itself attach liability, whether DOTD has conformed to those standards is a relevant factor in determining the ultimate issue of whether the roadway is unreasonably dangerous. Dill v. DOTD, 545 So.2d 994 (La.1989). Even without a duty to update the road in question to conform to current design standards or even to the design standards in place when it was hard-surfaced or ^overlaid, DOTD is not shielded from liability for all unreasonably dangerous defects in the road. Petre v. State ex rel. Dep’t of Transp. and Dev., 01-0876 (La.4/3/02), 817 So.2d 1107, 1113.
The condition of LA 964 was described by a series of lay and expert witnesses. Bennie Bell, whose house is adjacent to the accident site, stated at trial that he had lived there for twenty-two years, and that the road had been “real dangerous” the entire time. He said that when he hears “bam” on the road, he dials 911, and the operator is familiar with the address, because so many accidents occur there. He said “it’s something like eight people done got killed up there.... ” Bell also said the ditches were deep and the shoulder virtually nonexistent, since much of it had just washed away over the years. However, he also said that he drives a Greyhound bus and has driven it countless times in both directions on LA 964 carefully and without incident.
*695 Mike Amrhein was driving his ear southbound behind Moss when the accident occurred. He said that as Moss’s vehicle neared the curve, “coming into that turn ... was another vehicle that was northbound. And it was low and in our lane, and headed toward the vehicle in front of me.” When Amrhein first saw it, the oncoming vehicle was about 600-700 feet away from the Moss vehicle. He described the sequence of events and his reaction as follows:
Well, when I saw that it looked like the two of those were going to hit and it looked like they pretty much were going to hit head-on, I looked — I looked to the right or to the side and just made a determination I couldn’t go off the road. There was no place to go off. And I started putting my brakes on. At that point in time I fishtailed a little bit. And about then — about the same point in time the two vehicles looked like they made a little bit of a correction like they might miss each other, but they didn’t; and they hit. And at that point, you know, there wasn’t anywhere else for me to go. So what I did was I let off and tried to straighten up and just go as close to the vehicle on my left, which was the northbound vehicle; because as I saw them hit, when they started to come apart the first thing I could tell was that the northbound vehicle appeared to be staying basically stationary where it was. And that the darker vehicle in front of me moved off to the right.
Amrhein estimated his speed before applying his brakes was 50-55 miles per hour. There was a light drizzle and the road was wet. Elaborating on his discovery that he had no place to get off the road, he said that he “looked to the side and there was a ditch; and that was — you know, my mind just processed no, and then I looked back |7ahead.” After trying to brake and fishtailing on the wet pavement, he managed to straighten out and ride “a little between the two as they were coming apart.” Am-rhein estimated that the northbound Smith vehicle was not completely in the southbound lane before the accident, but “at least seventy-five percent in our lane.” Other than the slight movement just before the collision, he did not see the Smith vehicle move to return to the northbound lane.
Don Erwin, who at the time of trial was retired from the Louisiana State Police, was the trooper who investigated the accident. When he arrived, Smith’s Jeep Cherokee (the Smith vehicle) was facing south in the northbound lane; Moss’s Chevrolet Blazer (the Moss vehicle) was facing north in the ditch alongside the southbound lane. Erwin and the other investigating officers measured the accident scene. From edge to edge of the asphalt, the pavement width of the highway was 19.8 feet; the travel lane of the southbound lane was only 9 feet wide, while the northbound lane was 10.2 feet, and the center striped area was .6 feet. There were three gouge marks in the southbound lane where the collision occurred. Also, there was one skid mark near the center line of the highway, presumably from the Moss vehicle’s left front tire, which' indicated his brakes had been applied and the vehicle had made a slight turn to the right just before the collision. The impact marks on both vehicles were offset, establishing that both drivers turned toward their right in a last-second effort to avoid the collision. The highway was wet, but Erwin said he saw nothing in or on the roadway itself that might have caused the accident.
Michael Craig Jewell, an employee of Louisiana State Police Troop A, testified for DOTD as an accident reconstruction expert. He noted that .there was a small pothole, about three feet by one foot and *696 about- three-quarters of an inch deep, about 775 feet back from the accident near the center of the northbound lane. It was on the inside part of the worn path that most people drive in. The roadway was blacktop and was pretty well worn. There was some cracking in the roadway surface, some gravel debris and pebbles, and a tire depression where vehicles normally traveled on the road. Those depressions and the pothole held water in rainy conditions. Like Erwin, Jewell concluded that both drivers were trying to steer to their right to avoid the accident. |sThere was not much shoulder on the southbound side— between one foot and two and one-half feet between the travel lane and the ditch. About a hundred feet prior to the impact site, the pavement had a four and one-half inch drop-off from the pavement to the grass area that was on the shoulder. An edge line or fog line was present, but it was “eaten up pretty well.” The ditch was steep, especially on the southbound side where Moss was driving. Using “barrier equivalent velocity” calculations based on the crush conditions of the vehicles, Officer Jewell calculated that at the time of impact, both vehicles had slowed to 47 or 48 miles per hour. Although he did not measure for super-elevation, commonly called banking, he noticed that the road did not seem to have much, if any, super-elevation in the curve. He concluded that the Smith vehicle came out of the curve 775 feet away, crossed over the center line, and continued to proceed down the center line for some distance on the wrong side of the road as it approached the Moss vehicle. Close to the last possible minute, there was an attempt to steer back into the northbound lane, but this effort was unsuccessful and the two vehicles collided in the southbound lane. The only thing in the northbound lane that could have caused the Smith vehicle to cross the center line into the southbound lane was the pothole in her lane, but there was nothing to prevent her from moving back into the correct lane. However, Jewell also said that people tend to “low bank” when driving a curve, which involves drifting toward the oncoming lane as the curve is negotiated.
Richard Savoie, the deputy chief engineer for DOTD’s office of engineering, testified that when this accident occurred, he was in the road design section, supervising DOTD designers and consultants doing road design projects for DOTD. He brought a number of documents from DOTD records, which showed various projects on LA 964.[6] A 1924 plan showed a gravel road only fourteen feet wide with a five foot shoulder and a ditch on each side of the roadway. The right-of-way on each side of the center line was thirty feet— sixty feet total. The ditch slopes were shown as one and 13one-half to one, meaning that as you move one and one-half feet away from the top of the ditch, you will be one foot deeper. He later clarified that the ditch slopes varied all along the roadway, depending on whether and how much the roadbed was built up. A later proposal for resurfacing and acquisition of additional right-of-way was withdrawn in 1955. In 1958, there was a bituminous hot mix widening and overlay project, for which the “as built” plans showed an eighteen-foot-wide asphalt surface three inches deep with three-foot shoulders on each side of the roadway.
Another three-inch asphalt overlay project was completed in 1979 (the 1979 project); it was the last project preceding the accident. The “as-built” plans for the 1979 project showed two ten-foot-wide travel *697 lanes with aggregate shoulders one to four feet wide, averaging three feet wide, and with a ramp toward the ditch matching the existing slope, but “not steeper than 3:1.” Savoie stated that LA 964 was classified as a rural highway. He reviewed DOTD’s minimum design standards for overlay and/or widening and overlay of rural highways, dated April 29, 1977, which were in effect before the 1979 project. The plan stated, “The 1977 edition of the Louisiana DOTD standard specifications for roads and bridges as amended by the project specifications shall govern on this project.” Average daily traffic at that time was 2,070 vehicles. According to DOTD’s 1977 minimum design standards for that volume of traffic, the width of each traffic lane was to be eleven feet; however the 1979 project was completed and approved with only ten-foot-wide travel lanes. Savoie explained that the chief engineer’s signature on the completed plans functioned as an exception to the minimum design standards. Savoie later admitted that such an exception was not the norm. In fact, he said that in his twenty-seven years with DOTD, he “probably could count on my ten fingers and ten toes how many times I’ve seen a design exception.... ”
Savoie also testified concerning the edge lines. According to DOTD’s engineering directives, pavement edge lines were to be marked on all two-lane roadways with a width of twenty-two feet or more and on all multilane roadways. When asked why LA 964 had edge lines, even though it was less than twenty-two feet wide, he replied that there was nothing in the directives to prohibit edge lines when the pavement width was only twenty feet.
ImThe purpose of the ditches was to catch the water coming off the roadway, as well as runoff water coming toward the roadway from adjoining property. According to Savoie, DOTD is responsible for taking any water coming into its sixty-foot right-of-way and drain it to the low points, either a pipe or a bridge. It is important to keep as much water as possible off the road surface, because standing water deteriorates the roadway.
Savoie said there had been no reconstruction on LA 964 before the accident. A reconstruction would have required the purchase of additional right-of-way. The roadway could not have been reconstructed within the sixty feet of right-of-way, because a reconstruction had to be done in accord with the latest design standards used by DOTD. Savoie said that DOTD adopts its design standards from those recommended by AASHTO, and that those change periodically. However, AASHTO recognizes that just because a roadway was built under one design standard does not make it unsafe because new design standards have been developed. On cross-examination, Savoie admitted that over time, if newer design standards recommended wider travel lanes, but DOTD was not doing a reconstruction, it might widen the travel lanes on an older highway by taking space from the shoulders. In fact, this is what was done in the overlay projects on LA 964. He also said that if any work is done beyond the crown of the roadway, it is considered a reconstruction. Therefore, neither of the two overlay projects on LA 964 had any work done beyond the crown of the roadway, because it was not possible to do a reconstruction within the sixty-foot right-of-way.
Joseph Andre, who was retired from the Louisiana State Police, testified for the plaintiffs as an expert in accident reconstruction. Based on Amrhein’s testimony, Andre concluded that Moss had approximately six or seven hundred feet within which he could see the Smith vehicle approaching in his lane. Based on his calculations of the closing distance of the two *698 vehicles, Andre determined that Moss had between 3.7 and 4.5 seconds to perceive and react. Based on the crush measurements done by Jewell, he thought Moss might even have had additional time, because both vehicles had slowed down prior to impact. In that time, Moss could have gotten off the road and onto the shoulder and avoided the head-on collision. The photographs of the vehicles showed |nthat the Smith vehicle struck the Moss vehicle with the left front side of the Smith vehicle being in the center, approximately, of the Moss vehicle, and then tore through the left front corner of the Moss vehicle. Both vehicles ended up spinning counterclockwise. The Moss vehicle was pushed backwards and then spun 180 degrees, landing on its left side in the ditch on the southbound side of the road. Based on the gouge marks in the pavement, Andre concluded that at the time of impact, the right wheels of the Moss vehicle were right at the edge of the road, if not slightly off the edge of the roadway. Right at the point of impact, the shoulder was about two to three feet wide between the roadway and the ditch, and there was a culvert off the shoulder of the road just ahead. Because the road was wet, Moss could not avoid the collision simply by braking. And because there was insufficient shoulder for him to move laterally away from the oncoming vehicle, he had no options. Andre summarized his conclusions as follows:
Well, I think that Mr. Moss had time to slow his vehicle and get it under control, and had he had a place to — he had slowed to about thirty-three miles an hour before impact — he could have easily gotten off on the shoulder had there been enough shoulder for him to move laterally far enough to avoid a head-on collision, which would have been about six feet I estimate.
He also said:
[Ajnything would be better than a collision of this type, except to run off in a ditch and hit a culvert. If you go into a ditch of this type, with slopes, the fore slope and the back slope the way they were in this particular ditch, you’re going to start to tumble. As you go into this ditch, the front end is going to hit and you’re going to tumble the vehicle: and it’s going to be a very serious collision. Or if you hit the culvert, it’s going to tear the bottom out and tear the front out and cause the vehicle to overturn as well. So there would be a violent collision if he [were] to run off the road in this — with the roadway in this condition.
Andre further testified that he could understand why the Smith vehicle may have been in the opposite lane for some period of time, because “you can’t move from one lane totally into the other very quickly on a wet road, and especially in a curve.” So it would have taken some time for the Smith vehicle to move back into the northbound lane. He acknowledged, however, that if she was in the wrong lane for six to seven hundred feet, she had sufficient distance to slow her speed and change lanes to avoid the collision.
|iaJohn A. Womack, who was the Mayor of Zachary in 1997, had been with the Zachary Police Department for eleven years before being elected. In that capacity and in his capacity as mayor, he was very familiar with LA 964. He described the road as a two-lane road with very deep ditches in most locations and very narrow, if any, shoulders. Because of the numbers of fatalities, accidents, and problems associated with the condition of the road, the city council passed and adopted a resolution in 1991, requesting DOTD to grant priority and funding for improvements to LA 964. The resolution reported that the road was deteriorating rapidly, “resulting in better than one accident per week.” The council had the resolution published in *699 the local newspaper, in a further effort to get some relief in having the road improved. In the twenty-two years he had served as mayor, Womack could not recall any other similar resolution. Nothing was done to the highway between the passage and publication of that resolution and the accident in which Moss and Smith were killed.
Jimmy L. Waddell had lived all his life on LA 964 about three to four miles from the accident site. He described it as a narrow two-lane road that held water “real bad” during the rains, had no shoulder in places and only a very narrow shoulder in others, and had deep ditches. He said it was “[a] bad road to be on ... you know, you had no place to go if anything happened.” He said there was no place to go except into the ditch or a tree.
Albert Shields, a DOTD highway maintenance superintendent, whose duties included LA 964, testified that he took over the area in 2003. He looked for all the maintenance records pertaining to this highway at the accident site, but found the records were poorly maintained and not done properly. From those records, he could not tell whether anyone from DOTD had driven along the road to inspect it, although they were supposed to do so once every week or two weeks and note it in the records. When he took over the area, LA 964 was eroding or wearing away, with a drop-off from the roadway to the shoulder. He also said the road seemed narrower than it had been when he drove it regularly in the 1970s. When asked his impression regarding the people who had been maintaining the records and the roadway, Shields replied, “I would say they didn’t do their job.”
1,3James R. Clary, a licensed professional civil engineer, testified as an expert in highway design, highway signing, and land surveying. He concluded that LA 964 did not meet the standard under which it was constructed, lacked the basic safety features of a road that the state has a duty to provide, and, at the time of the accident, was hazardous. He had measured the lane width at the accident site, and stated that the southbound lane width for Moss was 9.42 feet and the northbound lane width for Smith was 9.67 feet; “[b]oth were below the ten feet that it was supposedly built to.” He also said that Moss was confronted with a shoulder two and one-half feet wide that was dropped from the pavement about four inches. Moss also was confronted with a ditch foreslope of 2.16 feet to one, which means for every two feet two inches, the elevation dropped one foot. This slope was steeper than it should have been, based on the DOTD documents. Clary explained that the smaller the ratio, the steeper the slope. He said:
And the steeper the slope, if you get off on a slope of say three to one or under, chances are you will not get back up, that you will either overturn or you will ride down the ditch until you stop or strike something in the ditch. And in Mr. Moss’s path were two driveways with culverts. If he went off of the road to try to evade or avoid, then he was going to strike these culverts, and he was confronted with a ditch that he could not recover from, that was more than likely going to turn him over.
With reference to Smith’s position, he stated:
You are in an area where Mrs. Smith, coming from the south, is coming through a curve, and that curve was supposed to be [super-elevated], banked, so when you go around the curve, the curve assists you by being banked to go around it. And there are certain regulations for how much banking you need, how much tilt you’re going to have. *700 Well, the road, as it existed at the time of the incident, had none. In many cases, it was either nonexistent, or flat, or about the original crown of the road or less. So there was no assistance from banking in this curve, and it was common for people in this area, the ones that I saw and including myself, coming through this curve to cut across. By cutting across, you use more pavement width. You can cut down the radius of the curve and make it easier to get through.
Based on Clary’s measurements of the lane width, neither driver had a travel lane ten feet wide. He reiterated that in 1977, DOTD came up with a new minimum design standard for overlay or widening of highways, which should have been followed in the 1979 project. According to those standards, for the volume of traffic on LA 964, there should have been eleven-foot travel lanes. The cross-section sheet for the 1979 |uproject showed only two ten-foot lanes, and DOTD did not even meet that standard. Clary had examined the public records, and found no documentation approving a variance for the 1979 project on LA 964. In his opinion, edge lines should not have been used on the narrower traffic lanes, because “people shy away from that line toward the center, and it gives you the effect of having even less lane.” He said the greatest problem with the road was “the failure to follow any safety standard or recommendation.... ” DOTD did not follow the overlay and widening standard, nor the standard governing edge lines, resulting in a roadway with no margin for error at all with regard to speed, width, the edge line, and the ditch.
Clary testified that within the sixty-foot right-of-way, it would have been possible to put two eleven-foot lanes, two four-foot shoulders, and two three-foot-deep ditches, with five feet left on either side of the road. He based his calculations on the plans for the 1979 project and measurements of the road, shoulders, and ditches. This would have provided a minimum tolerable condition for the shoulders.
Tom Ed McHugh, a Zachary resident for 63 years and former Mayor/President of the City of Baton Rouge/East Baton Rouge Parish for twelve years, testified that LA 964 “was recognized by most of the folks who lived in Zachary as one that you didn’t travel unless you had to.” He said there was a history of problems, and many people had lost their lives on that road, which he described as having no shoulders and large ditches.
Ronald Douglas Carter, a district traffic operations engineer for DOTD, testified as an expert in traffic engineering on behalf of DOTD. He reviewed photographs of LA 964 and identified a divided broken yellow line at the center of the roadway, a solid yellow “no passing” line, and white lines on each edge of the traffic lanes to delineate the edge of the roadway. These edge lines are designed to help drivers see the edge of the roadway to lessen the chance that they will run off the road, particularly at night. He was familiar with the requirement that edge lines be placed on all roadways twenty-two feet wide or wider, but did not know of any standards prohibiting the placement of edge lines on narrower roadways. However, he said DOTD typically does not place them on roadways that are less than twenty-two feet wide. Carter acknowledged that in his deposition, he said this was because of a concern that an edge line may tempt a 11fimotorist to drive too close to the center line and possibly invite a side swipe, which is a critical concern on a narrower road. But if work is done on a road with an existing edge line, DOTD would probably not remove it, because the driving public was accustomed to having it there.
*701 Finally, Dr. Joseph David Blaschke testified for DOTD as an expert in traffic engineering and highway design. With reference to the curve that Smith was coming out of, he did a “ball bank” test in the northbound lane where she was traveling, and got a reading showing that fifty-five miles per hour was the advisory speed for the curve. Since the speed limit on LA 964 was fifty-five miles per hour, that meant that from a traffic engineering standpoint, whether or not a curve warning sign was needed was purely discretionary. There was no curve warning sign for the northbound lane; there was one for the southbound lane where Moss was driving. That sign showed an advisory speed limit of fifty miles per hour. He did not do a test on the curve in the southbound lane, because that was beyond the accident site. Blaschke also discussed the super-elevation of the curve, noting that it appeared to be about two to three percent, which is a very gentle slope, comparable to the normal slope from the center to the edge of any flat roadway. The purpose of super-elevation is to bank the road so that it is easier for the driver to go around the curve. However, because the curve could safely be driven at fifty-five miles per hour, Blaschke said the degree of super-elevation was really irrelevant in this case,
Blaschke noted that the pavement markings, including the dashed and solid yellow lines in the center and the edge lines, appeared to be properly positioned. His measurement of the roadway from edge to edge of the pavement near point of impact was “right about twenty feet.” He said this was sufficient lane width for normal standard automobiles and SUV’s to travel safely, and was not uncommon for a road built in 1916. The ditches were there to keep water off the road, because a road becomes hazardous when water is on it, and also to collect water coming toward the roadway from adjoining terrain. From his observation of the ditches alongside LA 964, he assumed the drainage was adequate. He noted that the fore slope of this particular ditch in the area of the accident was around two to one, characterizing that as “very [ 1fisteep.” Even ditches designed for old highways generally had at least a three to one, which is not as steep. Blaschke said that research has shown that about a three to one slope is the point at which a driver can return; if the slope is steeper, the vehicle is probably not going to get back up on the road. He said that in order to build twelve-foot-wide lanes and six-foot-wide shoulders, a total reconstruction of the road would be needed.
Blaschke concluded that although the lane widths of ten feet were not the most desirable, they were certainly adequate, especially for passenger cars. The curve was not unreasonably sharp, could be driven at fifty-five miles per hour, and was not difficult to navigate due to lack of super-elevation. The pavement markings and signage were appropriate. The pavement was worn, but still functioning properly. It had not worn so smooth that drivers were losing control and sliding in wet weather. In summary, Blaschke concluded that although the roadway was certainly not modern, it was functional and was reasonably safe.
On cross-examination, Blaschke admitted that he had not measured the individual lane widths — only the edge-to-edge width of the roadway. Based on that, he estimated each lane was about ten feet. He did not measure the slope of the shoulder or the cross slope of the highway. He did not measure the ditch and its fore slope, but could observe that it was about two to one in most cases. He did not know the classification of the road, but said it was not necessary to know this, because on an existing road, the evaluation *702 of the road is based on what it is, not on what it would be if it were designed from scratch. He agreed that it would be preferable to have more than ten-foot travel lanes, stating that highway engineers “consider ten foot lanes to be the absolute minimum that we would like to have on any highway.” They would also prefer more than two-foot shoulders, but that did not affect his evaluation of the road “as it is relative to this accident.” Blaschke said, “This roadway is what it is, and it’s not unsafe.”
Based on the testimony from lay and expert witnesses, along with the photographs and other documentary evidence submitted in connection with their testimony, we conclude that the jury had a reasonable factual basis in the record for its I ^finding that LA 964 was unreasonably dangerous in normal use. All of the experts and lay witnesses testified that the shoulders were extremely narrow and did not provide sufficient space for a vehicle to get off the highway without running into the ditch. In addition, all of the experts stated that on the southbound side of the road where Moss was driving, the slope of the ditch was so steep that a vehicle entering it could not recover and regain the highway surface. In fact, the steep ditch presented a hazardous condition, in that a vehicle entering it would almost certainly flip over. The jury also heard from several experts that DOTD did not follow its own standards in the 1979 project when the highway was overlaid. There was further evidence that even without a reconstruction, the sixty-foot right-of-way would have allowed DOTD to widen the travel lanes to eleven feet each with four-foot shoulders on each side. Apparently, the jury chose to believe the testimony indicating that the road conditions could have been significantly improved without the need to purchase additional right-of-way or do a reconstruction. Based on our review of the entire record, we cannot find that the jury’s findings on this issue were manifestly erroneous.

Actual or constructive knowledge

We also find that the jury had sufficient evidence to conclude that DOTD had actual knowledge of the hazardous condition of the roadway. Its own employees recognized the problems of narrow lanes and shoulders and steep ditches. Six years before the accident, the Zachary city council passed a resolution asking DOTD to prioritize an upgrade on LA 964 due to the numerous accidents that were occurring there. In addition to being sent to DOTD, this resolution was published in the local newspaper. Therefore, the element of actual knowledge of the condition and a reasonable opportunity to repair is also met.

Causation

Cause in fact usually is a “but for” inquiry that tests whether the accident would or would not have happened but for the defendant’s substandard conduct. Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225, 1230. When there are concurrent causes of an accident, which nevertheless would have occurred in the absence of one of the causes, the proper inquiry is whether the conduct under | ^consideration was a substantial factor in bringing about the accident Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606, 611; McCain v. Howell, 06-1830 (La.App. 1st Cir.9/14/07), 971 So.2d 323, 327. Whether the defendant’s conduct was a substantial factor in bringing about the harm, and thus, a cause in fact of the injuries, is a factual question to be determined by the fact finder. Rideau v. State Farm Mut. Auto. Ins. Co., 06-0894 (La.App. 1st Cir.8/29/07), 970 So.2d 564, 574, writ denied, 07-2228 (La.1/11/08), 972 So.2d 1168.
*703 Much of DOTD’s argument concerning causation focuses on Smith’s condition and behavior. The evidence revealed that some time after she and her husband had gone to bed, Smith left her house and drove to Baton Rouge to go gambling on one of the riverboat casinos. When her husband awoke, he realized she was gone and, knowing she liked to go to the casino, he drove there and found her. He offered to drive her home, but she said she could drive, and she left the casino about 6 a.m. to return home. The accident occurred about 7 a.m. Blood tests revealed that Smith had not been drinking alcohol, but she had phenobarbitol in her system; it had been prescribed to her for a seizure disorder. DOTD posits that the accident was solely her fault and, regardless of the condition of the highway, the collision would have occurred due to her driving in the wrong lane.
There is no doubt that the accident would not have happened, “but for” the fact that Smith was driving on the wrong side of the road. However, that begs the question of whether, “but for” DOTD’s actions or inactions, the accident would not have occurred. The jury heard evidence that Moss had sufficient time to move onto the shoulder of the road and avoid the collision. However, there was virtually no shoulder onto which he could move. Photographs in the record show that at the accident site, what should have been a shoulder was sloped to such an extent that it actually functioned as the fore slope of the ditch. Had Moss attempted to use the shoulder, he would have been in a more precarious position, because he would almost certainly have flipped his vehicle in the ditch or hit a culvert.
Generally, when the court is examining a fatal accident, there is no way to ascertain the victim’s thought process in the moments preceding the accident. 119However, this case is unusual, in that there was a witness in a following vehicle who found himself in the same precarious and dangerous situation and had to make a choice about what to do to avoid harm. Amrhein certainly would have moved to the shoulder to avoid the impending collision in his lane just ahead of him; indeed, that was his first instinct. However, when he looked, his mind said “no,” because of the ditch and culvert. Concluding there was no place to go, he chose the only other option, which was to slow down and try to steer around the Smith vehicle after the collision. Neither the jury nor this court can know with certainty that Moss followed the same train of thought. But the evidence showed that he had moved as far to the right of his lane as possible before being hit by the Smith vehicle. This supports the inference that Moss came to the same realization as Amrhein about being unable to move to a shoulder and made the same decision as Amrhein to remain in his travel lane and hope Smith would pull back into her lane in time.
Therefore, there was reasonable evidence before the jury that “but for” the narrow travel lane, extremely narrow shoulder, and steep ditch, Moss could have avoided the accident and it would not have occurred.[7] His inability to avoid the impending collision was a concurrent cause of the accident. Based on the entire record, we find no manifest error in the jury’s conclusion that DOTD’s failure to take action to correct the hazardous conditions of LA 964 was a substantial factor in bring *704 ing about the accident. Therefore, we affirm the jury’s allocation of 30% fault to DOTD.
DAMAGE AWARDS FOR WRONGFUL DEATH
Much discretion is left to the judge or jury in the assessment of general damages. LSA-C.C. art. 2324.1. The initial inquiry must always be directed at whether the jury’s award for the particular injuries and them effects upon this particular injured person is a clear abuse as to the fact finder’s much discretion. Roberts v. Owens-Coming Fiberglas Corp., 03-0248 (La.App. 1st Cir.4/02/04), 878 So.2d 631, 643, writ denied, 04-1834 (La.12/17/04), 888 So.2d 863. In reviewing an award of general 12ndamages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert, denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La.1976); Rideau, 970 So.2d at 579.
While it is impossible to place a monetary value on the life of a person, our jurisprudential system has established that a monetary award is the appropriate remedy to one who has suffered the loss of a loved one as a result of the fault of another. Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 833 (La.1991). The elements of damage for wrongful death are loss of love, affection, companionship, services, and support, as well as medical and funeral expenses. See Duplantis v. Danos, 95-0545 (La.App. 1st Cir.12/15/95), 664 So.2d 1383, 1391; Rideau, 970 So.2d at 580.
In this case, the jury made separate awards for medical and funeral expenses, as well as for loss of future support. The only awards the plaintiffs contest are those for their loss of love, affection, companionship, and services from their husband and father. The evidence from the plaintiffs, Moss’s coworkers, friends, and community leaders demonstrates that his relationship with his family was very close. Tom Ed McHugh knew Moss in a professional setting, since Moss was the local government representative for Acadian for many years. But he also knew him personally, and Moss often went to a boutique owned by McHugh’s wife to buy gifts for Julia. Douglas Manship testified that his family owned a house on False River next to one owned by the Moss family, and that Moss was there with his family almost every weekend. He described him as a very steady type of person who spent as much time as possible doing things with his family. Keith Thompson, who worked with Moss at Acadian and l^had known him and Julia since 1978, was also a co-owner with Moss of the house on False River. He said almost every Friday, both families would head to the river and come back Sunday night. Thompson said he never heard Moss raise his voice to his children; he was the kind of guy who could get his message across without that.
Caitrin, who was twenty years old and attending LSU when her father died, had *705 worked with him at Acadian from the time she was fifteen, and they were very close. In addition to activities with the whole family, her father drove her to school every day, and they developed a very strong bond during this time that the two of them spent together. Her brother, Sean, said, “My sister and my dad had a very close relationship, very special relationship, and [his death] has had a very, very strong effect on my sister.” Caitrin said her father “just had such a presence. He was so respectful. He ... taught me a lot, as a mother now, how to treat your children, because he was so respectful towards us and he expected us to respect him as well....” She said that if she had been asked at the time what would be the worst thing that could happen to her, she would have said losing her father. Because Cait-rin could not imagine having a formal wedding without her father to walk her down the aisle, she and her fiance were married at the beach with no one in attendance. Sean was a senior in high school when his father died. He said he and his dad went to LSU sporting events together, to basketball games, and to the camp at False River for fishing and skiing. When the trial was held ten years after the accident, Sean still carried a picture of his father on the dashboard of his car.[8]
Julia described her relationship with her husband as “wonderful, absolutely wonderful.” She said he was kind and very respectful of her and everyone else. She and Moss met at LSU and were married on March 18, 1972. Moss worked for the ambulance company and taught emergency medical technician courses before buying the Acadian business from his employer in 1981. She worked with him there for five years. Julia said the family did almost everything together, including balloon festivals, | ^fishing, basketball, baseball, and football games, and the children’s sports. She said she was always proud to be his wife. Julia said that after his death:
[I]t’s difficult after you’ve had such a wonderful person in your life to just not have him any more, and to have somebody to help you make decisions with regard to the children. That was very, very difficult. Not going to things that we used to go to together.... When I go by myself, I feel out of balance.
She said holidays, especially Christmas, were especially difficult, because her husband was always very positive and excited about everything. The two of them had also worked on stained glass projects together, golfed, and gone bird watching together.
The jury awarded Julia and each of the children $20,000 in wrongful death damages. We realize that ten years after the accident, Moss’s family did not display to the jury the degree of grief and loss that would have been obvious in the immediate aftermath of his death. Yet, based on our review of the record, we conclude that the jury’s awards for wrongful death damages were an abuse of discretion. Moss was a respected businessman and community leader who was devoted to his wife and children. The loss of his steadying influence, positive energy, and presence in their lives cannot possibly be recompensed by the jury’s award. Therefore, we must look to other jurisprudence to determine an appropriate award for each of the plaintiffs.
In Roberts, 878 So.2d 631, the jury awarded $1,000,000 to the surviving spouse of a mesothelioma victim and $250,000 to *706 each of his three children. A wrongful death award of $300,000 to the surviving spouse and $200,000 to the child was affirmed by this court in O’Connor v. Litchfield, 03-0397 (La.App. 1st Cir.12/31/03), 864 So.2d 234, writ not considered, 04-0655 (La.5/7/04), 872 So.2d 1069. In a case brought by the adult children of a couple who died in an automobile accident, the jury award for wrongful death damages was $100,000 to each of the surviving children, as well as funeral and medical expenses. Davis v. Witt, 02-3102 (La.7/2/03), 851 So.2d 1119. A jury award of $125,000 in damages to each of the decedent’s two minor children and $100,000 in damages to each adult child was upheld by this court in Ratliff v. State ex rel. Dep’t of Transp. and Dev., 02-0733 (La.App. 1st Cir.3/28/03), 844 So.2d 926, writ denied, 03-1739 (La.10/10/03), 855 So.2d 350. In a case involving the death of a 26-year-old Philippine man who supported his parents, this court found the jury’s award of | ¾;$75,000 in wrongful death damages to each of his parents was an abuse of discretion, and raised the award to $150,000 for each parent. Duzon v. Stallworth, 01-1187 (La.App. 1st Cir.12/11/02), 866 So.2d 837, writ denied sub nom. Duzon ex rel. Community of Acquets and Gains v. Stallworth, 03-0589 (La.5/2/03), 842 So.2d 1101. This court reduced a surviving spouse’s $1,000,000 wrongful death award to $500,000 in Wingfield v. State ex rel. Dep’t of Transp. & Dev., 01-2668 (La.App. 1st Cir.11/8/02), 835 So.2d 785, writ denied, 03-0313 (La.5/30/03), 845 So.2d 1059. The jury in that case had also awarded $70,000 in loss of support and funeral and medical expenses. The Wingfield case cited previous jurisprudence, including Gibson v. State, Dep’t of Transp. & Dev., 95-1418 and 95-1419 (La.App. 1st Cir.4/4/96), 674 So.2d 996, writs denied, 96-1862, 96-1895, and 96-1902 (La.10/25/96), 681 So.2d 373 and 374 (close relationship and difficulty of wife in recovering from the death of her spouse was considered in award of $350,000); Rick v. State, Dep’t of Transp. & Dev., 93-1776, 93-1784 (La.1/14/94), 630 So.2d 1271 (supreme court considered the fact that a couple worked together every day in the family business as grounds for reinstating the trier of fact’s award of $400,000); and Faucheaux v. Terrebonne Parish Consol. Gov’t, 625 So.2d 683, 685 (La.App. 1st Cir.1993) (loving relationship and 27-year marriage were factors considered in affirming award of $300,000). Wingfield, 835 So.2d at 808. In contrast to these awards is a jury award of $75,000 to a loving spouse who had only been married to the decedent for one month prior to his death in an automobile accident. Temple v. State ex rel. Dep’t of Transp. and Dev., 02-1977 (La.App. 1st Cir.6/27/03), 858 So.2d 569, writ denied, 03-2116 (La.11/7/03), 857 So.2d 501. Also, in Shilling ex rel. Shilling v. State ex rel. Dep’t of Transp. & Dev., 05-0172 (La.App. 1st Cir.12/22/05), 928 So.2d 95, writ denied, 06-0151 (La.4/24/06), 926 So.2d 541, this court found no abuse of discretion in a $70,000 wrongful death award to a young man whose father was killed when he was only four years old and who told a counsel- or some years later that he barely remembered his father or the incident. In that case, although the father spent time with him on some weekends, the child’s parents were divorced and he lived with his mother.
|P4In reviewing this jurisprudence, we have given the greatest weight to cases involving surviving spouses with long, stable, and happy marriages, and to those involving adult children who had very close and positive relationships with their parent. With those considerations in mind, we conclude that the lowest reasonable amounts the jury could have awarded for *707 Moss’s wrongful death were $300,000 to Julia and $100,000 each to Caitrin and Sean. We will amend the judgment accordingly.
REIMBURSEMENT TO WORKERS’ COMPENSATION INSURER
LWCC seeks reimbursement of the full amount of $227,250 that it paid to Julia in death benefits pursuant to Acadian’s workers’ compensation insurance policy, rather than 30% of that amount, as awarded in the judgment. LWCC bases its claim on a stipulation entered into between the parties and on LSA-R.S. 23:1101(B).
In the stipulation entered into between LWCC and Julia, LWCC admitted that Moss was employed by Acadian and was in the course and scope of his employment when the accident occurred; that LWCC had in effect a workers’ compensation insurance policy issued to Acadian; that LWCC had paid death benefits in the amount of $227,250 to and/or on behalf of Julia as of March 25, 2005; that LWCC was subrogated legally, contractually, and equitably to the full extent of its past and future payments; and that in the event of a judgment against DOTD, “the parties jointly stipulate and agree that the compensation lien of the Intervenor, [LWCC], shall be recognized entitling it to the statutory first dollar recovery out of the proceeds of such Judgment, ... on a priority basis -with interest from the date of judicial demand including those amounts paid as from March 25, 2005, through the date that the Judgment ultimately becomes final and paid.”
With reference to LWCC’s compensation lien, the judgment stated:
IT IS ORDERED, ADJUDGED AND DECREED that the workers’ compensation lien in favor of the Inter-venor, Louisiana Workers’ Compensation Corporation (LWCC), in the amount of 30% of $227,250.00 as of March 25, 2005, is recognized!,] entitling LWCC to the statutory first dollar recovery out of the proceeds of this judgment on a priority basis with interest as stated above from March 25, 2005, through the date this judgment becomes final and paid.... However, this statutory lien is subject to percentages of comparative fault found by the jury as stated above and this lien amount is not a separate damage award but shall be paid out of the amounts stated above.
| «Both the stipulation and the judgment refer to the “statutory” first dollar recovery out of the proceeds of the judgment. The referenced statute is LSA-R.S. 23:1101(B), which states:
Any person having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit in district court against such third person to recover any amount which he has paid or becomes obligated to pay as compensation to such employee or his dependents. The recovery allowed herein shall be identical in percentage to the recovery of the employee or his dependents against the third person, and where the recovery of the employee is decreased as a result of comparative negligence, the recovery of the person who has paid compensation or has become obligated to pay compensation shall be reduced by the same percentage. The amount of any credit due the employer may be set in the judgment of the district court if agreed to by the parties; otherwise, it will be determined pursuant to the provisions of R.S. 23:1102(A). (Emphasis added).[9]
*708 Subsection (C) defines “third person” as any party who causes injury to an employee at the time of his employment.
LWCC’s first argument is that the stipulation contained no language allowing for the reduction of LWCC’s lien based on the fault of a third party. However, as noted above, the stipulation states that LWCC’s recovery is based on statutory provisions governing its reimbursement. LWCC filed a statutory intervention in this suit for reimbursement of compensation benefits pursuant to LSA-R.S. 23:1102(A)(1), and in accordance with the provisions of LSA-R.S. 23:1101(B), the recovery allowed LWCC “shall be identical in percentage to the recovery of the employee or his dependents against the third person,” since there was no comparative negligence by Moss in this matter. Moreover, the stipulation provides that LWCC will be entitled to “the statutory first dollar recovery out of the proceeds of such Judgment.” (Emphasis added). The “proceeds of such Judgment” in this case are limited to the payment by DOTD of 30% of the damages suffered by the plaintiffs, and thus, there was no “reduction” of LWCC’s lien. The stipulation also states that LWCC was “subrogated legally, contractually, and equitably to the full extent of its past and future payments.” Subro-gation is the substitution of one person to the rights of another. LSA-C.C. art. 1825. Thus, LWCC’s frights cannot be greater than the rights of the plaintiffs. In this case, because the nonparty was found to be 70% at fault, the plaintiffs’ recovery is limited to the allocation of 30% fault to DOTD, and based on subrogation, LWCC’s recovery was correctly limited to that same percentage.
LWCC also interprets LSA-R.S. 23:1101(B) as allowing a reduction of its reimbursement only for an injured employee’s negligence, but not for the fault of a third party. However, LSA-R.S. 23:1101(B) clearly states that the recovery of the party who has paid workers’ compensation benefits “shall be identical in percentage to the recovery of the employee or his dependents against the third person....” In this case, the only third person against whom suit was filed was DOTD. The jury determined that DOTD was liable for 30% of the damages awarded to Moss’s family. Therefore, under the clear wording of the statute, LWCC’s recovery of death benefits it paid to Julia was correctly set at that identical percentage. LWCC would ignore the first portion of the sentence and enforce only the second portion, which allows a reduction in the recovery if the employee is found partially at fault. We reject that interpretation, as it essentially writes out the first portion of the sentence. Moreover, to accept LWCC’s argument would result in the anomalous situation that an employee who is partially at fault for his own injuries would have to reimburse the workers’ compensation payor less than an employee who is not at fault in any way, but who can only recover a portion of his damages from a third party. Under the statutory provisions, LWCC’s cause of action against DOTD was limited by LSA-R.S. 23:1101(B) to recovery identical in percentage to that of the plaintiffs, ie., 30% of the death benefits paid to Julia. Accordingly, we find no legal or manifest error in the court’s determination that LWCC is entitled to recover only 30% of the benefits it paid to Julia, which is identical in percentage to the recovery of the Moss family against DOTD.
Our holding on this issue does not violate the provisions of LSA-R.S. *709 23:1103(A)(1), because with respect to the damages recovered, “such damages shall be so apportioned in the judgment that the claim of the [employer’s insurer] for the compensation actually paid shall take precedence over that of the injured employee or his dependent.” (Emphasis added). The reference to “such damages” in the context of lj>7the facts of this case relates to the award of 30% of the death benefits paid to Julia. Therefore, the judgment of the trial court correctly provided for the payment of this sum.
CONCLUSION
Based on the foregoing, we amend the judgment of June 1, 2007, to award Julia wrongful death damages in the amount of $300,000 and to award Caitrin and Sean wrongful death damages in the amount of $100,000 for each of them. In all other respects, the judgment is affirmed. All costs of this appeal, in the amount of $9,896.76, are assessed to DOTD.
AMENDED, AND AFFIRMED AS AMENDED.
DOWNING, J., dissents and would find no fault of DOTD but concurs in the amendment of damages.

. According to the briefs, the Moss family settled their claims against Smith’s succession.

. The legislation enacting LSA-C.C. art. 2317.1, effective April 16, 1996, abolished the concept of strict liability governed by prior interpretations of LSA-C.C. art. 2317. Since that date, a more appropriate term for liability under Articles 2317 and 2317.1 and LSA-R.S. 9:2800 might be "custodial liability,” which now requires a finding of actual or constructive knowledge. Morgan v. City of Baton Rouge, 06-0158 (La.App. 1st Cir.4/4/07), 960 So.2d 1013, 1016 n. 1.

. AASHTO is an acronym for the American Association of State Highway and Transportation Officials.

. Because this accident occurred in 1997, we must evaluate this case using the law as it existed at that time. Therefore, our decision cannot be influenced by changes in the law since then, such as the additions of LSA-R.S, 48:35(F) through (I), effective July 9, 1999, which are applicable prospectively only. See 1999 La. Acts, No. 1223, §§ 1-3. At the time of this accident, LSA-R.S. 48:35 stated, in pertinent part:
A. The Department of Transportation and Development shall adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of state Highway and Transportation Officials. Hereafter, the state highway system shall conform to such safety standards....
B. The chief engineer may designate highways within the state highway system for reconstruction or repair at standards which are less than those as approved by the American Association of State Highway and Transportation Officials; however, no reconstruction or repair shall be done on any highway under this Part which results in a pavement width of less than eighteen feet, and all reconstruction or repair done under this Part shall be accomplished within the existing right-of-way.

. Savoie did not bring any documents showing the original construction of LA 964; later testimony established that it had been built in 1916.

. While we might consider it somewhat less probative, the jury also heard evidence from one of DOTD’s own experts suggesting that Smith may have moved into the opposite lane to avoid a pothole holding water in her lane of travel, and then stayed there to make negotiating the unbanked curve easier.

. The delay in bringing this matter to trial was partially due to a writ action that went to the Louisiana Supreme Court on the issue of the production and admissibility of Smith’s medical records. See Moss v. State, 05-1963 (La.4/4/06), 925 So.2d 1185.

. Although there have been two amendments to the language of subsection (B) since the *708 date of the accident, neither of those is relevant to the legal analysis regarding this claim, See 2005 La. Acts, No. 257, § 1.